629 F.2d 338
 30 UCC Rep.Serv. 865, 7 Fed. R. Evid. Serv. 1336
 T. J. STEVENSON & CO., INC., a corporation, Plaintiff and
Counterclaimant, Appellee-Cross-Appellant,
v.
81,193 BAGS OF FLOUR, etc., Defendant.
ADM MILLING CO., INC., Defendant, Counterclaimant & Third
Party Plaintiff- Appellant, Cross-Appellee,
v.
T. J. STEVENSON & CO., INC., MV NEDON, etc., Defendants as
to Counterclaim,
Republic of Bolivia, Ministry of Industry, Commerce and
Tourism, Third Party Defendant
Counterclaimant-Appellee, Cross-Appellant.
 No. 77-2523.
 United States Court of Appeals,
Fifth Circuit.
 Oct. 27, 1980.
 
 R. M. Crowe, Mobile, Ala., A G. V. Parker, Cranford, N. J., for ADM milling.
 George F. Wood, Sidney H. Schell, Mobile, Ala., for T. J. Stevenson.
 Alex T. Howard, Jr., Thomas S. Rue, Mobile, Ala., for Ministry of Industry & Tourism, Republic of Bolivia.
 Appeals from the United States District Court for the Southern District of Alabama.
 Before BROWN, HILL and RANDALL, Circuit Judges.
 JOHN R. BROWN, Circuit Judge:
 
 
 1
 With this decision we hopefully end, in all but a minor respect, an amphibious imbroglio[1] and commercial law practitioner's nightmare involving three shiploads of enriched wheat flour.[2] By a coincidence in this confusing case, each shipload of flour became infested, to varying degrees, with confused (triboleum confusam) and red rust (triboleum casteneum) flour beetles (sometimes called weevils). None of the parties involved-seller, buyer, and carrier-acted faultlessly over the course of the transaction. All brought their differences to the able District Judge for resolution. The District Judge carefully considered five weeks of testimony presented by the parties, their numerous pleadings, motions, briefs and arguments, scores of interlocking mixed law-fact issues, and difficult questions of federal civil procedure, state commercial, and admiralty law. The Judge's careful and lengthy opinion, 449 F.Supp. 84 (S.D. Ala. 1976), resolved the imbroglio but failed to fully convince the parties. The District Judge convinced us, however, and we affirm in almost all respects. Without pause to reflect on the complications that simple insects-confused flour beetles or otherwise-can create in the lives of men and Courts, we proceed to explain our decision.
 
 
 2
 I. The Life-Cycle Of This Appeal: Inception, Growth, And Development
 
 A. The Documents
 
 3
 In April 1974 the Republic of Bolivia entered into two contracts for the purchase of 26,618 metric tons of American enriched wheat flour from ADM Milling Co.[3] ADM owns a number of mills throughout the Midwest. Bolivia sought the flour for distribution to her citizens. The contracts were prepared on ADM's standard form, with quantity, chemical specifications, price, mode of shipment, payment terms, and delivery details filled in. The contracts required packing the flour in 100 pound capacity cotton bags and delivering it to Mobile, Alabama. Railcar shipment was contemplated to Mobile, followed by ocean carriage to South America. This was to take place from May to September 1974. The contracts contained the following delivery terms: "F.A.S. MOBILE, ALABAMA, for export;" and "Delivery of goods by SELLER to the carrier at point of shipment shall constitute delivery to BUYER. . . ." Upon satisfactory delivery, the price was payable by irrevocable letter of credit.[4]
 
 
 4
 Each contract contained an express warranty of merchantability:
 
 
 5
 Except as provided on the reverse side, SELLER MAKES NO WARRANTY, EXPRESS OR IMPLIED, THAT EXTENDS BEYOND THE DESCRIPTION ON THE FACE HEREOF, except that the product sold hereunder shall be of merchantable quality. . . .
 
 
 6
 There was also an express warranty clause on the reverse side of each contract:
 
 
 7
 WARRANTY: SELLER expressly warrants that any goods contracted for herein will be representative of the brand or grade specified herein to be sold, and will comply with all of the applicable provisions of the Federal Food, Drug and Cosmetic Act and of any applicable State Pure Food and Drug Act.
 
 
 8
 But that warranty clause also contained the following notice requirements:
 
 
 9
 BUYER hereby waives any claim or defense based on the quality of the goods specified herein, unless (1) within ten (10) days after BUYER learns by use or otherwise of the defect complained of, but in any event within twenty (20) days after receipt of notice of arrival of said goods at destination, BUYER sends SELLER at SELLER'S main office a letter by registered mail specifying the nature of the complaint and (2) within said twenty (20) days send by parcel post or express prepaid to SELLER'S said office a five (5) pound sample of the goods alleged to be defective or inferior . . .
 
 
 10
 The contracts further contained a merger and parol evidence clause[5] and specified that Illinois law would govern construction of the terms and conditions.
 
 
 11
 In order to arrange ocean carriage of the flour, Bolivia engaged the services of St. John International, Inc., a Washington, D.C., shipping broker. St. John eventually contacted T. J. Stevenson & Co., a company furnishing transportation through tramp steamers. Stevenson and Bolivia entered into a booking note on April 27, 1974, specifying that Stevenson would present ships at Mobile between May and October 1974 and transport the flour to South America. The booking note expressly provided that the Carriage of Goods by Sea Act, 46 U.S.C.A. §§ 1300 et seq. ("COGSA"), "shall govern throughout the entire time the goods are in the custody of the carrier."[6] The booking note also contained two provisions governing payment of freight to Stevenson. The first stated that payment of each vessel's freight would be by irrevocable letter of credit, which in turn required presentment of "clean" bills of lading.[7] It was also provided that Stevenson's freight would be deemed paid, though not by irrevocable letter of credit, as soon as the ship was fully loaded: "Freight to be prepaid in full . . . on delivery of original bill of lading. . . ." Under that provision, it is agreed, Stevenson was entitled to freight on issuance of bills of lading whether or not the ship actually sailed.
 
 
 12
 B. The Flour: Manufacturing And Delivery To Mobile
 
 
 13
 Seven flour mills scattered throughout the Midwest manufactured the flour involved in this case.[8] Because of a strike at ADM's largest mill, four of the seven were independent mills subcontracted by ADM to provide large portions of the flour.[9] The remaining three mills were of course ADM owned and operated.
 
 
 14
 In each of the mills, a number of sieves having various degrees of fineness are part of the production process. The very last step in that process takes the flour through a "rebolt" sifter, which is usually clothed with a fabric sieve fine enough to remove even the microscopic eggs of flour beetles. Thereafter, the flour is packed for shipment. Sometimes there is little or no delay between manufacturing and packing the flour. At other times, however, the flour is stored in bins for a substantial period prior to packing. Sanitation programs, including inspection of the flour and plant fumigation, are also a part of the production process of each plant. During the relevant period, however, the record discloses that the programs and their implementation varied amongst the mills. For example, the three ADM mills tested the flour far more frequently than did three out of four of the independent mills.
 
 
 15
 Packing the flour in cotton bags does not ensure freedom from external insect contamination. Adult flour beetles are capable of entering a cotton bag through the seams, and if present in large numbers are likely to do so. In addition, flour beetle larvae which happen to hatch near the surface of a cotton bag can work their way through the weave. If this occurs, the larvae will eventually mature into adult beetles, which may produce more eggs and internally infest the bags of flour. Of course, flour beetles can also get out of bags which they have infested, crawl or fly to other bags, and infest those. Consequently, the mills took a number of precautions against insect infestation even after the flour was packed and during its shipment by railcar to Mobile. The railcars, for example, were generally inspected, cleaned, fumigated, and lined with paper.
 
 
 16
 The flour involved in this case was shipped from the mills to Mobile by railcar during a period from early August to early October 1974. As the flour reached Mobile, it was taken from the railcars, put on pallets, and stored in waterfront warehouses operated by the Alabama State Docks Department. Checkers from the State Docks and from Stevenson's local agent, Page & Jones, Inc., observed the external appearance of the flour as it was unloaded. The State Docks then issued receipts noting the flour's apparent condition, which were signed by Page & Jones checkers. Except for some wet, torn, and damaged bags, no insect contamination was noticed outside of the bags during unloading. However "no internal inspection or sampling was made at this point for the presence of infestation . . . ." 449 F.Supp. at 92.
 
 C. Events In Mobile: Part I
 
 17
 While the flour was in the State Docks warehouses, ADM employed Superintendence, Inc., to sample and test-weigh the flour and to prepare Certificates of Quality which ADM needed to collect payment of the purchase price. One of the tests employed by Superintendence involved taking a small amount[10] of grain out of 2% of the bags, by means of a grain probe. The grain samples were then sent to Superintendence laboratories for testing.
 
 
 18
 On September 19, 1974, Stevenson presented the M/V Arizona for loading at Mobile. Loading began the following morning. A second Stevenson vessel, the M/V Southwall, began loading three days later, on September 23. In preparation for these loadings, Superintendence took, between September 4 and September 20, 1974, samples of the flour intended for the ships. As each sample was drawn, it was sent to a Superintendence laboratory to be analyzed. However, none of the samples were analyzed until September 24, several days after loading of the ships had begun. Although during loading, no one "observed any apparent infestation" of the flour, id. at 96, late on September 24, Superintendence's laboratory announced that it had found evidence of live internal infestation by flour beetles in 36 and 1/2 railcar lots, 19 of which had already been loaded. Stevenson immediately declared a temporary halt to the loading. At that point, the Southwall was almost completely loaded while the Arizona was considerably less complete, perhaps only half-loaded.
 
 
 19
 A number of conversations between agents of Stevenson, of ADM, St. John personnel (representing Bolivia), and Superintendence, among others, ensued. ADM instructed Superintendence to fumigate the 17 and 1/2 infested lots which had not been loaded and to hold those lots in the warehouses until the next shipment. Nothing was agreed concerning the 19 infested lots aboard the ships, however. Stevenson resumed loading of the ships, with apparently clean flour, but also decided that "on board" fumigation of the flour would be necessary before the ships sailed. During these events, the various parties or their agents were in nearly continuous communication with one another, both orally and by telex, concerning the infestation discovered, fumigation, and related matters. On September 26, the Southwall (with 5 and 1/2 of approximately 37 lots known to be infested) was fumigated. The next day, the Arizona (with 13 and 1/2 of approximately 90 lots known to be infested) was similarly fumigated.
 
 
 20
 One important subject of the discussions between the parties during this period concerned the extent to which the "on board" bills of lading should be claused by Stevenson. In order for ADM to collect its purchase price and Stevenson its freight under their respective irrevocable letters of credit, Stevenson had to issue "clean" bills of lading-bills of lading declaring the shipments "in apparent good order and condition."[11] Stevenson's first inclination was to clause the bills of lading to indicate live infestation of the flour. Even after fumigation of the ships, Stevenson initially took the position that it could not issue clean bills of lading unless ADM provided Stevenson with a letter of indemnity holding Stevenson harmless. ADM refused, however, reiterating that it had delivered only good, clean flour to Mobile and was not in any way responsible for the infested flour. Subsequently, Stevenson obtained a report from the fumigating company indicating that all infestation had been killed. ADM, moreover, assured Stevenson that flour containing dead infestation met the contracts' specifications. Consequently, after informing the parties or their agents of those developments, Stevenson released clean bills of lading for the Arizona and Southwall cargoes. On September 30, 1974, the ships set sail for South America. Shortly thereafter, ADM received its purchase price and Stevenson its freight under their respective letters of credit.
 
 D. Detention In Arica
 
 21
 As a landlocked country, Bolivia imports much of its ship-carried goods by way of Chile. A treaty between Bolivia and Chile permits free importation of goods to Bolivia by way of the Port of Arica in Chile. 449 F.Supp. at 89 n.5.
 
 
 22
 The Arizona and Southwall arrived at Arica on October 12, 1974. The vessels began to discharge their cargoes on October 14, 1974. Soon after unloading began, live insect infestation on both ships' cargoes was detected. Further examination revealed internal infestation was present in moderate amounts throughout almost all of the flour on both ships. A port official immediately advised Sub-Secretary Heran Landivar of the Bolivian Ministry of Industry, Commerce, and Tourism of the infestation. As the District Judge found, Landivar immediately instructed the port official "to refuse the shipment of flour aboard the SOUTHWALL and ARIZONA . . . and then Landivar confirmed his order by telex . . . the following day." 449 F.Supp. at 105. Neither the telex nor the substance of Landivar's later testimony were revealed to Stevenson or ADM, however, until Landivar appeared at trial. Consequently, when Arica port officials refused to allow the Arizona and Southwall to discharge their cargoes, it was not readily apparent whether that refusal stemmed from Bolivia's dissatisfaction with the quality of the cargoes or from the port officials' fear that their port would be contaminated by the infested flour.
 
 
 23
 From October 14 to November 5, 1974, Stevenson arduously negotiated with Arica port officials, Landivar, and others to obtain permission to unload the two ships. During this period the infested cargoes were surveyed by experts, and it was indicated by some that with fumigation, shifting, and repackaging the flour could be made fit for human consumption. After unloading resumed on November 5, 1974, these procedures were in fact followed by a local salvage firm. Eventually, the Arizona and Southwall flour was shipped by rail to Bolivia and sold at a reduced price to consumers.E. Events In Mobile: Part II
 
 
 24
 Just following the discovery in Arica of infestation aboard the Arizona and Southwall, Stevenson presented the M/V Nedon at Mobile for loading the last shipment of flour. The remaining flour was of suspicious quality, however, because of its close ties to the troubled cargoes of the Arizona and Southwall : the flour was stored in the same two State Docks warehouses; many of the railcar lots of flour came from the same three independent mills that had been linked with the previous infestation problems; and the 17 and 1/2 railcar lots held back from the Arizona and Southwall were among the flour in this last shipment. Moreover, despite the intervening fumigation of the 17 and 1/2 railcar lots held back from the previous shipments, between October 12 and 17 an additional 13 car lots of flour were found to be infested. Unfortunately, when Superintendence arranged for the fumigation of those 13 car lots, one car lot was omitted. Subsequently, therefore, that car lot was loaded aboard the Nedon without being fumigated. Compounding these problems was the fact that at no time was the entire warehouse fumigated. Rather, the 17 and 1/2 and 12 car lot groups were simply "pulled some several feet from the other cargo and fumigated." 449 F.Supp. at 106.
 
 
 25
 Seeking to avoid the problems of the Arizona and Southwall, Stevenson required Superintendence to clear in writing all cargo to be loaded on the Nedon. In addition, the Nedon's holds were cleaned, though not fumigated, and then inspected by the National Cargo Bureau. On October 15, 1974, loading of car lots cleared by Superintendence began.
 
 
 26
 On the following day, Stevenson took the added precaution of having its own tests run on the flour not yet loaded aboard the Nedon. Near the end of the October 16 loading day, the test results came back from the laboratory. The results indicated "that there was no live (flour beetle) infestation, but remains (of beetles) were noted." 449 F.Supp. at 107. Later that evening, Stevenson received further information that several more of the samples contained dead infestation. Id. at 107. Also that evening, apparently because of its underwriters' insistence that a London surveyor examine the Nedon cargo, Stevenson decided to "hold" the Nedon in Mobile "until further notice." Id. at 108.[12] The District Judge also found, however, that "Stevenson was awaiting the full (laboratory) report which was to be released on October 17." Id.[13]
 
 
 27
 Despite the discoveries and its decisions on the evening of October 16, the following morning Stevenson resumed loading the Nedon. By the end of the day, loading was complete, with some 81,193 bags of flour on board. No external live infestation had been observed by anyone during loading.
 
 
 28
 Consistent with the "hold" decision made on the evening of October 16, the fully-loaded Nedon did not, however, set sail for South America. Besides waiting for the London surveyor to reach Mobile, Stevenson was grappling with the necessity of clausing the Nedon bill of lading. Stevenson's underwriters were unhappy that the bills of lading for the Arizona and Southwall had not been claused[14] and threatened to refuse claims connected with the Nedon unless that ship's bill of lading was claused. Although it is not clear when the Nedon bill of lading was actually issued, the record shows that issuance occurred sometime after the October 17, 1974, date indicated on the bill of lading. See 449 F.Supp. at 109-10 (bill of lading issued only after it was determined that Nedon was infested and after Bolivia refused the Nedon cargo). As finally issued, the bill of lading was claused to indicate: "Cargo infested by insects prior to loading."
 
 
 29
 On October 19, 1974, the London surveyor arrived. The surveyor examined the Nedon cargo and found live and dead infestation, especially in the No. 1 hold. The infestation was very largely due to flour beetles. The surveyor recommended that the cargo be fumigated before entering into tropical South American waters. He further advised that the bill of lading be claused "with respect to such infestation and/or fumigation as requisite." The surveyor also inspected the State Docks warehouses which appeared "comparatively clean." 449 F.Supp. at 109.
 
 
 30
 Because of the infestation problems in the last three shipments of flour, on October 24, 1974, Bolivia took steps to prevent further payments to ADM under the irrevocable letter of credit. On October 25, 1974, Bolivia told Stevenson not to permit the Nedon to leave for South America. In the course of a meeting on October 31, Bolivia notified ADM that it "rejected" the Nedon flour. ADM, however, replied, as it had all along, that it had no interest in the flour since risk of loss had passed to Bolivia at the time the flour was delivered to the warehouses.
 
 
 31
 Because of this aptly described "hands off policy," 449 F.Supp. at 111, Stevenson was left with: a fully-loaded Nedon ; a shipper-consignee which refused to permit shipment or accept delivery of the cargo; and a supplier without interest in regaining its goods. Despite Stevenson's ensuing attempts, neither Bolivia nor ADM could be persuaded to take responsibility for the flour. Stevenson tried to sell the flour itself but was unsuccessful. Efforts to discharge the Nedon cargo were similarly unsuccessful because of legal and other restrictions. 449 F.Supp. at 123. Stevenson made no attempt to fumigate the flour aboard vessel, however. The record shows that Stevenson felt, in light of its experience with the Arizona and Southwall cargoes, that fumigation aboard ship was futile. The Nedon's cargo was tightly stowed and the holds were full, so that the fumigant gas would be unlikely to penetrate very far into the flour. Stevenson felt that fumigation could only be successful after the flour was taken ashore and spread out.
 
 
 32
 On November 11, Bolivia requested the United States Department of Agriculture ("USDA") to inspect the Nedon cargo. The USDA inspected on November 12 and found "pretty heavy" infestation throughout the flour. Only the flour in the No. 1 hold was found so infested that it was unfit for human consumption, however; the infested flour in the Nos. 2, 3 and 4 holds was found fit for human consumption if fumigated.
 
 
 33
 Finally, Stevenson broke the impasse by filing this lawsuit against the cargo in rem on November 21, 1974. Surveyors examined the cleanliness of the Nedon itself, as well as the cargo, on December 2, 1974. On December 10, ADM entered a claim of ownership as to the cargo, and posted bond. The Nedon was finally unloaded in Mobile on December 14 and 15, 1974. The flour was then placed in a State Docks warehouse, and fumigated.
 
 
 34
 ADM subsequently attempted to sell the Nedon flour but found it difficult to do so. On February 7, 1975, the flour was finally sold at a substantial discount for use in the manufacture of ceiling boards.
 
 
 35
 After setting out findings much lengthier than our summary of the facts, the District Judge awarded Stevenson and Bolivia substantial damages. Stevenson was awarded $92,014.82 against Bolivia for the detention of its ships Arizona and Southwall in Arica; and $310,067.25 against ADM as claimant of the Nedon cargo, for prepaid freight, detention, and other charges incurred by that ship. Bolivia was awarded $325,960.51 for breach of contract damages against ADM for the Arizona and Southwall flour. In addition, the loss resulting from the salvage sale of the Nedon flour was left on ADM, and the cost of fumigating the Arizona and Southwall flour was left on Stevenson.
 
 
 36
 From that judgment, every party appeals. In sum, over a score of errors are asserted. ADM's complaints against Bolivia mostly involve issues concerning the flour quality and sales contracts' interpretation, especially with respect to the Arizona and Southwall flour. Bolivia appeals issues relating to the detention in Arica. ADM's complaints against Stevenson concern the care of all of the flour involved, as well as the award for freight and damages connected with the Nedon. Stevenson argues for an increase in the Nedon award, and for reimbursement from ADM of fumigating expenses. Our tasks delineated, we begin our labors.
 
 II. Flour Beetle Confusion
 
 37
 One issue permeates this case. The issue is central to evaluating the performance by ADM and Bolivia of their flour contract obligations; determination of the party responsible for loss after the flour left ADM's custody and before it reached the custody of Bolivia or the Court; and sorting out the rights and duties of ADM, Bolivia, and Stevenson regarding care and transportation of the flour.
 
 
 38
 The issue is: what was the source of the flour infestation? This issue was the focus of proceedings in the District Court. After hearing the sometimes conflicting testimony of 49 witnesses during five weeks of trial, considering hundreds of exhibits, and evaluating the extensive arguments by counsel, the District Judge concluded that infestation began either on the rail cars or at three independent mills supplying substantial amounts of the flour.[15] Neither of the warehouses nor the ships were the source of any significant infestation.[16] ADM now asks us to hold the District Judge's infestation findings clearly erroneous.
 
 
 39
 We have repeatedly sought, but without too much success, to teach counsel
 
 
 40
 "that in this kind of controversy (the) functions of the courts in the judicial hierarchy are distinct and different" and we would "undermine the vitality of the system by a too-quick meddling in the principal business of a trial court. * * * A trial of a hotly contested, sharply disputed case is the task of a trial court" and reviewing courts "even in admiralty * * * should be slow to overturn fact decisions made by the judge before whom the facts are annealed through the hammering, heating process of vigorous, running advocacy."
 
 
 41
 Grigsby v. Coastal Marine Service of Texas, Inc., 412 F.2d 1011, 1020, 1969 A.M.C. 1513, 1523-24 (5th Cir.1969) (quoting Ohio Barge Line v. Oil Transport Co., 280 F.2d 448, 449, 1961 A.M.C. 375, 376 (5th Cir.1960)). Factual findings grounded on a correct legal standard "come here well armed with the 'buckler and shield of F.R.Civ.P. 52(a).' " Horton v. United States Steel Corp., 286 F.2d 710, 713 (5th Cir.1961). "We do not retry the case." Smith v. United States, 287 F.2d 299, 301 (5th Cir.1961). "It is well settled that in order for a reviewing court to set aside findings of fact by a trial court sitting without a jury, it must be clearly demonstrated that such findings are without adequate evidentiary support in the record, or were induced by an erroneous view of the law, and the burden of showing that the findings are clearly erroneous is on the one attacking them." Chaney v. City of Galveston, 368 F.2d 774, 776 (5th Cir.1966) (footnote omitted).
 
 
 42
 ADM's attempt to demonstrate the District Judge clearly erroneous begins with evidence that the flour mills operated sanitation programs and shifting machinery which precluded flour beetle infestation. With slight equivocation, ADM's expert entomologist testified that mill conditions could not have been the source of infestation: the rebolt sifters remove even beetle eggs and the sanitation programs were adequate. Testimony was also introduced to show that no insects were observed on the outside of the bags during the rail car unloading. ADM also alludes to evidence that the rail cars were prepared in a sanitary fashion and to the discovery at Arica, Chile, of limited numbers of insects other than flour beetles in or around the Arizona and Southwall flour. In sum, ADM theorizes that the flour became infested by means of a massive external attack, either at the warehouses or aboard ship.
 
 
 43
 There is, however, abundant, substantial evidence, much of it expressly accepted by the District Judge in various subsidiary findings of fact, which counters that proffered by ADM. For example, flour from three of the independent mills was found to be infested to a significantly greater extent than flour from the other four mills. 449 F.Supp. at 116. ADM does not explain how a massive external attack could selectively infest the flour. The three independent mills also have less stringent sanitation programs and fewer inspections than ADM operated mills. Flour in the three independent mills was sometimes stored for substantial periods following sifting but before bagging, making infestation more possible. The sieve material on rebolt sifters sometimes tore, possibly allowing flour beetles into the bags of flour. Id. at 114-17. In addition, the fact that no insects were observed on the bags during the unloading of the rail cars does not preclude infestation of an unobservable nature inside of the bags of flour.
 
 
 44
 Perhaps the most telling evidence concerns the extent and character of the infestation first discovered in samples taken in Mobile by Superintendence from September 4 to September 20, 1974. Car lots totalling between 40,000 and 50,000 bags of flour were found infested at that time. Id. at 118. Flour beetles at various stages of development were found inside the bags. At the time of sampling, the flour had been in the warehouses for, on the average, less than a month. The biological facts concerning flour beetles, as found by the District Judge and not disputed by the parties, are that flour beetles under the relevant conditions mature from egg to larvae to pupa to adult in six weeks. Id. at 118. In addition, while egg, larvae, and pupa have little or no mobility, the adult flour beetle is very mobile and can easily reach all areas of an enclosed space. Comparing these biological facts with (i) the limited period that the sampled flour had been in the Mobile warehouses and (ii) the discovery of widespread infestation inside the bags of flour and at various stages of development, it is easily inferable that the infestation began and even had multiplied in the flour before it reached the state docks warehouses. Indeed, at trial an expert entomologist so conceded. See id.
 
 
 45
 Finally, there was substantial evidence that neither warehouses nor ships were the source of infestation. Flour from previous shipments had been recently stored in the warehouses without problem and there was evidence that ships and warehouses were relatively clean. 449 F.Supp. at 93-94.
 
 
 46
 As this summary of the record demonstrates, substantial evidence abounds in support of the District Judge's finding of infestation prior to arrival in Mobile. We hold that the Judge's finding was not clearly erroneous. In so doing we also point out our view, and that of the District Judge, of the nature of flour beetle infestation of flour. The presence of "only" partial infestation is roughly the equivalent of being only "a little bit pregnant." Adult flour beetles are quite capable of moving between bags of flour and penetrating previously clean bags. The red rust flour beetle is especially mobile since it is a strong flyer. 449 F.Supp. at 118 n.51. The adult female beetle will lay "better than an egg a day," id., causing rapid growth in the infestation. These characteristics in sum render even clean flour susceptible to total infestation if it is stored in unprotected proximity to infested flour. Consequently we view partial infestation of flour with the understanding that all nearby and vulnerable flour is in a sense also "infested."
 
 III. A Visit To Illinois
 
 47
 The next group of issues we consider requires interpretation of the flour contracts between ADM and Bolivia. The contracts state that Illinois law governs their interpretation, so we look in the first instance to that state's statutes and Court decisions. Cf. Sperry Rand Corp. v. Industrial Supply Corp., 337 F.2d 363 (5th Cir. 1964). Because in all relevant respects Illinois has adopted without change the Uniform Commercial Code (1972 ed.) ("UCC" or "Code"), Ill.Ann.Stat. ch. 26, §§ 1-101 et seq. (Smith-Hurd),[17] we are also aided by precedent in the 48 states outside of Illinois which have in almost identical fashion adopted the Code.
 
 
 48
 As our analysis of these issues unfolds, it will become apparent that we, like the District Judge, refer to a limited amount of evidence extrinsic to the contracts. Such evidence was presented at trial by all of the parties for the purpose of interpreting the flour contracts. All of the parties presented extrinsic evidence despite the flour contracts' attempt to exclude such evidence by means of a merger and parole evidence clause. On appeal, the merger and parole evidence clause is invoked only as to selected evidence relating to two issues. Since we resolve those issues without need to refer to the disputed evidence,[18] we have no need to construe the parole evidence questions raised in this appeal.
 
 A. The Warranty
 
 49
 The District Judge held that the flour in each of the three shipments failed to meet the express warranty provisions of the contracts. ADM expressly warranted that the bagged flour would be "of merchantable quality" and that it would "comply with all of the applicable provisions of the Federal Food, Drug and Cosmetic Act ('FDA')." The District Judge decided that the infested flour breached both warranties. We, however, pretermit analysis of the FDA warranty since it is difficult to interpret[19] and unnecessary to our resolution of this case. Instead we examine only ADM's warranty of merchantability.
 
 
 50
 The Code defines the minimum standards required of "merchantable" goods:
 
 
 51
 Goods to be merchantable must be at least such as
 
 
 52
 (a) pass without objection in the trade under the contract description; and
 
 
 53
 (b) in the case of fungible goods, are of fair average quality within the description; and
 
 
 54
 (c) are fit for the ordinary purposes for which such goods are used ; and
 
 
 55
 (d) run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and
 
 
 56
 (e) are adequately contained, packaged, and labeled as the agreement may require; and
 
 
 57
 (f) conform to the promises or affirmations of fact made on the container or label if any.
 
 
 58
 UCC § 2-314(2) (emphasis supplied). Like the District Judge we consider only the subsection (c) portion of that definition, and do not reach the arguably applicable standards of subsections (a) and (b).[20] The question is therefore whether the flour at various critical points in time was "fit for the ordinary purposes for which such goods are used."
 
 
 59
 Official Comments 2 and 8 provide helpful clues to divining the parties' intent (emphasis supplied):
 
 
 60
 2. The question when the warranty is imposed turns basically on the meaning of the terms of the agreement as recognized in the trade. Goods delivered under an agreement made by a merchant in a given line of trade must be of a quality comparable to that generally acceptable in that line of trade under the description or other designation of the goods used in the agreement.
 
 
 61
 8. Fitness for the ordinary purposes for which goods of the type are used is a fundamental concept of the present section and is covered in paragraph (c). As stated above, merchantability is also a part of the obligation owing to the purchaser for use. Correspondingly, protection, under this aspect of the warranty, of the person buying for resale to the ultimate consumer is equally necessary, and merchantable goods must therefore be "honestly" resalable in the normal course of business because they are what they purport to be.
 
 
 62
 These comments amplify what is implicit in the statute: "fit for ordinary purposes" merchantability is an ambiguous phrase which has little meaning unless trade usage and other extrinsic evidence is considered. A substantial amount of extrinsic evidence was accordingly admitted and considered by the District Judge in evaluating ADM's warranty of merchantability.[21]
 
 
 63
 Before reviewing the facts, we observe that finding what the parties meant by "merchantability" requires some evaluation of standards in the commercial market and the state of the art in flour manufacturing.[22] The merchantability of infested flour to be sold to consumers is a question of degree and kind. We have often recognized that no food is completely pure.[23] The FDA has long permitted very small amounts of insect fragments and other dead infestation in food products.[24] To declare that any contamination of flour - even by small amounts of insect fragments, renders the flour unmerchantable would no doubt be out of step with commercial reality and would wreak havoc on food manufacturers and distributors while affording little or no additional protection to the consumer. What this case involves, however, is significant amounts of live infestation, by flour beetle eggs, larvae, pupae, and adults. Here the question is: How much live infestation renders consumer-destined flour unfit for the ordinary purposes for which it is used?
 
 
 64
 The record in this case contains a number of relatively undisputed facts that shed light on the meaning of "merchantable" flour. First, flour beetle infestation in flour mills is an ever present and difficult to eliminate problem. Some flour buyers, such as the United States Government, have however been able to keep infestation problems in their flour to a bare minimum by using their own inspectors to test the flour during its manufacture and at various points thereafter. Also, the relatively stringent precautions taken in ADM-operated mills have reduced infestation problems in their flour to a very great degree. The record further shows that flour containing live infestation, though possibly not dead remains, must be completely fumigated before it can be sold to consumers. Such fumigation is, however, not a normal preparation undertaken by flour buyers. In this context, the fact that the flour involved in the instant case had to be fumigated takes on great significance. Cf. UCC § 1-205(1). As the District Judge stated, "Clearly, if wheat flour found to be infested with beetles would have passed the above (merchantable quality) test . . ., there would have been no need for the flour to have been fumigated. . . ." 449 F.Supp. at 126. We believe that the District Judge's observation closely tracks the Official Comments' statement that goods intended for resale to consumers, as here, are not merchantable unless " 'honestly' resalable in the normal course of business."[25] The evidence in sum indicates that consumer-intended flour containing substantial amounts of live infestation is not merchantable under prevailing standards.
 
 
 65
 We are not aware of any precedent, in Illinois or elsewhere, which considers the issue of merchantability under circumstances similar to the instant case.[26] Several factually distinguishable cases do tend to support our conclusion, however. A provocative example is Cunningham v. MacNeal Memorial Hospital, 47 Ill.2d 443, 266 N.E.2d 897 (1970), in which the Illinois Supreme Court held that hepatitis present in transfused blood breached a warranty of merchantability, even though the disease was impossible for the manufacturer or hospital to detect and eliminate.[27] In contrast, it is clear that with large numbers of inspections live infestation can be detected in and eliminated from flour. Also distinguishable but supporting our conclusion is the decision of a Michigan Court that applesauce that tastes or smells bad but is nonetheless fit for human consumption is under some circumstances unmerchantable. Martel v. Duffy-Mott Corp., 15 Mich.App. 67, 166 N.W.2d 541 (1968). Under Missouri law, cheese containing bacteria "capable of " producing a harmful condition was found unmerchantable since it was "not suitable for the ordinary purpose for which it is used; namely, for consumption by the consumer." Safeway Stores, Inc. v. L. D. Schreiber Cheese Co., 326 F.Supp. 504, 508 n.10 (W.D. Mo. 1971). Moreover, in dictum adopted by our Court en banc, we have observed that in "cases . . . where the product contained mice, flys, slime, mud, bugs, roaches and worms, . . . (l)ittle doubt exists that the presence of such articles in a product intended for human consumption renders said product . . . unmerchantable as a matter of law", Green v. American Tobacco Co., 391 F.2d 97, 106, 112 (5th Cir. 1968) (Fla.) (dissenting opinion), adopted as the opinion of the Court en banc, 409 F.2d 1166 (1969).
 
 
 66
 Judicial interpretation, trade usage, and course of dealing point to but one conclusion as to flour infested with significant amounts of live flour beetles: although the flour may be "fit for human consumption" in the sense that it can be eaten without causing sickness, it is nonetheless not of merchantable quality. Such flour is not what is normally expected in the trade. It is not what ADM agreed to supply to Bolivia. Our holding is a narrow one. We do not say, for example, that one live beetle egg in a batch of 10,000 bags of flour renders that flour unmerchantable. Nor do we decide the merchantability of flour containing dead infestation in large or small amounts. Furthermore, we construe only the merchantability standard for flour which will be resold to consumers, not for flour sold directly to consumers. Finally, we emphasize that merchantability is an evolving standard, so that what is unmerchantable at one time and on one record may not be so in another case. In sum, we conclude that the District Judge was not erroneous in finding that the infested flour was not in conformity with ADM's warranty of merchantability.
 
 B. Risk Of Loss
 
 67
 Since it has been established that consumer-intended flour containing substantial amounts of live infestation is unmerchantable and that the infestation in this case began before the flour reached the State Docks warehouses, we are confronted with the issue of which party is to be responsible for the further infestation of the flour as it stood in the warehouses or lay in Stevenson's ships. The UCC's concept of risk of loss allocates responsibility for the further infestation between the buyer and the seller, leaving the responsible party free, however, to try to recover its loss from the carrier.[28]
 
 
 68
 The parties in this case have vigorously argued the point of "delivery" of the flour by ADM: whether it was at the State Docks warehouses or at the later loading of the ships. In part, this point has been argued because in most cases, determining whether buyer or seller bears the risk of loss involves only identification of the Code's "delivery" point:
 
 
 69
 Risk of Loss in the Absence of Breach.
 
 
 70
 (1) Where the contract requires or authorizes the seller to ship the goods by carrier
 
 
 71
 (a) if it does not require him to deliver them at a particular destination, the risk of loss passes to the buyer when the goods are duly delivered to the carrier even though the shipment is under reservation (Section 2-505); but
 
 
 72
 (b) if it does require him to deliver them at a particular destination and the goods are there duly tendered while in the possession of the carrier, the risk of loss passes to the buyer when the goods are there duly so tendered as to enable the buyer to take delivery.
 
 
 73
 UCC § 2-509(1) (emphasis supplied). Thus the parties have focused their attention on the meaning of the flour contracts' "F.A.S. MOBILE, ALABAMA for export" delivery term and the District Judge's somewhat ambiguous finding that delivery occurred as the flour was loaded aboard the ships.[29] ADM quite naturally makes much of the slight ambiguity in the Judge's finding and argues that when certain extrinsic evidence is disallowed, we must conclude that delivery occurred before the flour was even placed in the State Docks warehouses.
 
 
 74
 But we need not decide in this context whether the Judge's "delivery" point finding was correct, and we assume without so deciding that ADM's delivery point is the correct one.[30] We do so because of the clear applicability of a provision of the UCC which was specifically drafted to cover situations in which defective goods are delivered to a carrier and further deterioration ensues.[31] Section 2-510(1) provides:
 
 
 75
 Effect of Breach on Risk of Loss.
 
 
 76
 (1) Where a tender or delivery of goods so fails to conform to the contract as to give a right of rejection the risk of their loss remains on the seller until cure or acceptance.
 
 
 77
 This provision is not difficult to apply. First, we assume that delivery occurred just before the flour was placed in the warehouses. We secondly have decided that the District Judge correctly found the flour substantially infested at that point. Third, we have decided that such infestation breaches the contracts' merchantability provision. The only question, then, is whether delivery of unmerchantable flour gave Bolivia a "right of rejection." If so, risk of loss remained on ADM until Bolivia "accepted" the flour.
 
 
 78
 Determining Bolivia's "right of rejection" requires us to assume, contrary to what actually occurred, that Bolivia inspected the flour and discovered the live infestation at the time that the flour arrived in Mobile and was unloaded into the warehouses. The question then becomes whether Bolivia could have then rejected the flour. Section 2-601 permits the buyer to reject if the tendered goods "fail in any respect to conform to the contract."[32] This "perfect tender rule" has not been strictly applied, however.[33] Moreover, UCC § 2-612[34] says that in installment contracts such as this, only material nonconformities justify rejection.[35] Even considering those qualifications of the perfect tender rule, we know of no case holding that substantially unmerchantable goods must be accepted. The flour in this case was substantially infested when it arrived in Mobile and became more infested thereafter. Since it was materially nonconforming at the time it arrived in Mobile, the flour could have been rejected by Bolivia at that time. Thus Bolivia had a "right of rejection."
 
 
 79
 We therefore conclude that under § 2-510(1)'s plain language, the risk of loss of the infested flour remained on ADM "until . . . acceptance" by Bolivia. For the Nedon flour, it is uncontested that Bolivia never accepted; the flour was rejected before the ship left Mobile harbor. For that flour, risk of loss was always on ADM. But Bolivia did accept the Arizona and Southwall flour. ADM and Bolivia now take the position that acceptance of that flour occurred while the ships were in Mobile, though at slightly different times. Like the District Judge, we however disagree. We decide below that Bolivia did not accept the Arizona and Southwall flour until it reached South America. Our conclusion means that ADM bore the risk of loss of the Arizona and Southwall flour until those vessels arrived in South America and their cargoes were inspected and "accepted by" agents of Bolivia. Because our conclusion concerning the point of acceptance of the Arizona and Southwall flour is important to several of the issues in this case, we now proceed to explain our determination of that point.
 
 
 80
 C. Point Of Acceptance: Arizona & Southwall Flour
 
 
 81
 In the Court below, Bolivia argued that it did not accept the Arizona and Southwall flour until it reached South America. Now, for apparently tactical reasons best known to its counsel, Bolivia has changed its position and argues that acceptance occurred before the ships left Mobile. But the District Judge found in Bolivia's favor on its breach of contract claim and in so doing adopted Bolivia's original position that acceptance occurred in South America, not Mobile. The District Judge's implicit finding is revealed by his assessment of damages, which depended on the point of acceptance.[36]
 
 
 82
 By computing damages using Bolivian prices, the District Judge clearly rejected ADM's argument that acceptance occurred in Mobile and adopted Bolivia's argument (at that time) that there had been no reasonable opportunity to inspect and hence no acceptance in Mobile, but rather that acceptance occurred in South America.[37]
 
 
 83
 Proceeding to the correctness of the District Judge's finding of acceptance, the Code provides that the buyer has a right to inspect the goods before he is deemed to have accepted:
 
 
 84
 Unless otherwise agreed and subject to Subsection (3), where goods are tendered or delivered or identified to the contract for sale, the buyer has a right before payment or acceptance to inspect them at any reasonable place and time and in any reasonable manner. When the seller is required or authorized to send the goods to the buyer, the inspection may be after their arrival.
 
 
 85
 UCC § 2-513(1) (emphasis supplied). Nor does the fact that ADM received payment for the flour prior to its arrival and acceptance in South America affect the determination of the proper point of acceptance:
 
 
 86
 Payment pursuant to Subsection (1) does not constitute an acceptance of goods or impair the buyer's right to inspect or any of his remedies.
 
 UCC § 2-512(2).[38]
 
 87
 Instead, the point of acceptance turns on the buyer's right to inspect the goods:
 
 What Constitutes Acceptance of Goods
 
 88
 (a) Acceptance of goods occurs when the buyer
 
 
 89
 (1) after a reasonable opportunity to inspect the goods signifies to the seller that the goods are conforming or that he will take or retain them in spite of their non-conformity; or
 
 
 90
 (2) fails to make an effective rejection (Subsection (1) of Section 2.602), but such acceptance does not occur until the buyer has had a reasonable opportunity to inspect them; or
 
 
 91
 (3) does any act inconsistent with the seller's ownership; but if such act is wrongful as against the seller it is an acceptance only if ratified by him.
 
 
 92
 (b) Acceptance of a part of any commercial unit is acceptance of that entire unit.
 
 
 93
 UCC § 2-606 (emphasis supplied). A reasonable opportunity to inspect the goods is of course determined in light of the surrounding facts and circumstances.[39] It is undisputed that no one representing Bolivia examined the Arizona and Southwall flour in Mobile. The flour was not in fact inspected by Bolivian agents until it reached the South American port of Arica, Chile. The Code recognizes that the existence of payment-related documents such as the quality certificates and bills of lading (which were used by ADM to obtain payment under the letter of credit) do not affect the point of acceptance, nor the buyer's right to inspect. There is further evidence that although Bolivia, through St. John, was aware of the live infestation discovered by Superintendence in Mobile, news of the ensuing fumigation of the flour gave Bolivia every reason to believe that all of the flour beetles had been killed and that inspection could wait until the flour reached South America. Given these facts and circumstances, we cannot say that Bolivia's decision to inspect the flour in Arica was outside of the zone of "reasonable opportunity."
 
 
 94
 As the Arizona and Southwall began unloading in Arica, Bolivian agents began inspecting the flour and found live infestation. Bolivia immediately instructed port officials to prevent further discharge of the cargoes, a situation which lasted from October 14 until November 5, 1974. From approximately October 14, ADM was made well aware of Bolivia's dissatisfaction with the cargoes and of Bolivia's feeling that ADM was responsible. But ADM was never clearly told that Bolivia would not accept the flour. Moreover, when the ships were finally allowed to unload on November 5, Bolivia took the flour, salvaged it, and resold it to its regular distributors.
 
 
 95
 These facts indicate that following the flour's inspection in Arica, Bolivia must be deemed to have accepted the flour. The Code presumes that the buyer accepts goods unless, following a reasonable opportunity to inspect the goods, the seller is unequivocally and seasonably notified that the buyer is rejecting the goods. UCC § 2-606(1)(b); Stamm v. Wilder Travel Trailers, 44 Ill.App.3d 530, 3 Ill.Dec. 215, 358 N.E.2d 382 (5th Dist. 1976). See also UCC § 2-602(1). Bolivia's conduct in obstructing discharge of the cargoes while not clearly indicating that it rejected (or accepted) the flour brings the Code's presumption of acceptance into effect.[40] The application of that presumption is a largely factual matter. See Cook Industries, Inc. v. Community Grain, Inc., 614 F.2d 978, 980 (5th Cir. 1980) ("Although the interpretation of a contract is normally a question of law . . ., that interpretation frequently depends heavily on the resolution of factual disputes."). The District Judge thoroughly evaluated Bolivia's conduct in this regard. 449 F.Supp. at 103-05. His subsidiary findings certainly support an ultimate finding of § 2-606(1)(b) acceptance in Arica. We therefore find that the District Judge was correct in concluding that acceptance of the Arizona and Southwall flour was effected in Arica, not in Mobile.
 
 D. Notice Of Breach
 
 96
 By accepting the Arizona and Southwall flour, Bolivia is of course not prevented from seeking breach of warranty damages from ADM. UCC § 2-607(2) ("acceptance does not of itself impair any other remedy provided by this Article . . ."); Gillespie v. Werner Co., 43 Ill.App. 947, 2 Ill.Dec. 760, 357 N.E.2d 1203 (1976). Some "notice" to ADM concerning the flour is, however, a requisite of Bolivia's breach of warranty claim. Berry v. G. D. Searle & Co., 56 Ill.2d 548, 309 N.E.2d 550 (1974). Section 2-607(3)(a) sets out the UCC's notice requirement (emphasis supplied):
 
 Where a tender has been accepted
 
 97
 (a) the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy ; . . . .
 
 
 98
 A provision of the flour contracts adds to the UCC's requirement the following contractual requirement (emphasis supplied):BUYER hereby waives any claim or defense based on the quality of the goods specified herein, unless (1) within ten (10) days after BUYER learns by use or otherwise of the defect complained of, but in any event within twenty (20) days after receipt of notice of arrival of said goods at destination, BUYER sends SELLER at SELLER'S main office a letter by registered mail specifying the nature of the complaint and (2) within said twenty (20) days send by parcel post or express prepaid to SELLER'S said office a five (5) pound sample of the goods alleged to be defective or inferior . . .
 
 
 99
 ADM contends that under both § 2-607(3)(a) and the contractual provision, it never received adequate notice of the defects of the Arizona and Southwall flour. ADM accordingly asserts that Bolivia's breach of contract remedy is barred and that the damages awarded to Bolivia must be reversed.
 
 
 100
 (i) Notice Under § 2-607(3)(a)
 
 
 101
 In Illinois it is well-established that § 2-607(3)(a)'s requirement of notification of breach of warranty need not be in any particular words and is ordinarily a question of fact, looking to all the circumstances of the case.[41] Notice need not be written.[42] It may be given in a single communication or derived from several.[43] It is also well-established that "notice under section 2-607 need not be a specific claim for damages or an assertion of legal rights." Eastern Air Lines, Inc. v. McDonnell Douglas Corp., 532 F.2d 957, 976 (5th Cir. 1976) (Calif.) (citing 2 R. Anderson, Uniform Commercial Code § 2-607:25, at 218 (1971)).
 
 
 102
 Beyond these principles, however, Courts have disagreed in their interpretations of § 2-607(3)(a)'s notification requirement. A few decisions, largely from the Eighth Circuit and from Oregon, have held that the seller need only be informed that "the transaction is still troublesome and must be watched."[44] And if the troublesome nature of the transaction is moreover apparent or already known to the seller, no notice at all is required.[45] In Eastern Air Lines, Inc. v. McDonnell Douglas Corp., supra, however, this Court decided that for merchant buyers § 2-607(3)(a) requires something more than the minimal notification endorsed by those Courts. 532 F.2d at 970-80. We held that the dual policies of "encouraging compromise" and "promoting good faith in commercial relations," id. at 972, underlay the notice requirement of § 2-607(3)(a). Notice consequently must fulfill those policies; merely indicating that the transaction is troublesome is not enough. One way in which the policies are fulfilled is by notice informing the seller that the buyer regards the contract as breached by the seller, though specific legal rights need not be invoked. Id. at 973, 976.
 
 
 103
 The Eastern Air Lines interpretation of § 2-607(3)(a) has been adopted by the vast majority of Courts which subsequently have considered the issue.[46] It is also significant that the Eighth Circuit, which decided three cases which we declined to follow in Eastern Air Lines, recently decided a case under Illinois law and adopted the Eastern Air Lines view of notification. Southern Illinois Stone Co. v. Universal Engineering Corp., 592 F.2d 446, 452 (8th Cir. 1979). Because we regard the Eighth Circuit as very knowledgeable concerning Illinois law and considering the wide acceptance of Eastern Air Lines ' view of notification, we hold that Illinois law requires application of the Eastern Air Lines principles to this case.[47]
 
 
 104
 Our Eastern Air Lines decision grew out of McDonnell Douglas's late delivery over a period from 1965-1969 of aircraft ordered by Eastern. The contract required a high degree of cooperation and communication between the parties. Beginning even before the expected time of the first aircraft's delivery, Eastern continuously expressed dissatisfaction with the delivery schedule. Finally, Eastern sued for damages. The District Judge found that that evidence of Eastern's communications with McDonnell Douglas was sufficient to permit a directed verdict that § 2-607(3)(a) notice had been given. A jury then considered other issues and returned a verdict in Eastern's favor. We reversed, ruling that examination of the "entire course of conduct during the years 1965-1969" revealed enough doubt concerning notification to preclude a directed verdict for either party and to require evaluation by the jury as factfinder. 532 F.2d at 978. We emphasized that Eastern's expressions of dissatisfaction were less than unequivocal in view of the parties' cooperative arrangement and Eastern's failure to cancel future aircraft deliveries. It was not clear to a reasonable certainty that Eastern's alleged notice was sufficient to encourage compromise by McDonnell Douglas. Furthermore, there was evidence which created a jury question concerning the second policy of notification, the encouragement of commercial good faith. For example, Eastern at times praised McDonnell Douglas's performance and made public statements that might "well have led McDonnell to believe that it was not in breach of the agreement." Id. at 978. During the 1965-1969 period encompassing the alleged breaches of contract, Eastern negotiated several new contracts with McDonnell Douglas without attempting to raise or settle its claims under the original contract. Added to this were the assurances by Eastern during 1968 that it would not seek delay damages from McDonnell Douglas. All of this, we held, created a question of the adequacy of Eastern's notification which was fact question calling for resolution by the fact-finder.
 
 
 105
 Eastern Air Lines therefore teaches two concepts. First, the factfinder's determination of the mixed law-fact issue of notice, if based on a correct understanding of the law, is to be given great weight.[48] Second, § 2-607(3)(a) notice must be evaluated from the perspective of the policies which it seeks to encourage: compromise by the parties; and conduct within the bounds of commercial good faith.[49]
 
 
 106
 Applying these concepts to the instant case, we first observe that while the District Judge did not make elaborate findings concerning notice, he did treat it as a fact question and recognized that Eastern Air Lines requires more than minimal notice:A purpose of section 2-607 notice requirement is to inform the seller that his tender is non-conforming, but also to open the way for settlement through negotiations between the parties.
 
 
 107
 449 F.Supp. at 129 (emphasis supplied). Because of this appreciation for the appropriate legal standard, we give great weight to the District Judge's conclusion that "the facts are sufficient to find that Bolivia gave adequate notice under (s) 2-607(3)(a) to ADM . . . ." Id.
 
 
 108
 Second, the record reveals a number of specific communications, as well as additional inferable ones, between Bolivia and ADM, which must be evaluated for adequacy under the § 2-607(3)(a) policies. Soon after Superintendence first discovered the infestation of the flour, ADM agreed to pay for fumigation of the car lots still in the warehouses, although it did not agree to fumigate the flour already loaded aboard the Arizona and Southwall. St. John, as agent for Bolivia, telexed ADM to request that ADM take responsibility for fumigating the flour loaded aboard the Arizona and Southwall :
 
 
 109
 RE: WEEVILS INFESTATION IN BAGGED FLOUR VESSELS "SOUTHWALL" AND "ARIZONA".
 
 
 110
 PER OUR TELEPHONE CONVERSATION THIS MORNING WE HAVE NOW RECEIVED THE FOLLOWING TWX FROM STEVENSON, THE OPERATORS OF BOTH REFERENCED VESSELS.
 
 QUOTE
 
 111
 WEEVILS HAVE BEEN FOUND IN THE FLOUR LOADED ON BOTH M/S ARIZONA AND M/S SOUTHWALL. THIS NECESSITATES FUMIGATING BOTH VESSELS WHICH IS FOR SUPPLIERS ACCT. ALSO ANY VESSEL TIME LOST ACCT FUMIGATING IS FOR SUPPLIERS ACCT. INCLUDING LODGING AND FEEDING OF THE CREW IF THEY MUST BE REMOVED FROM THE VESSEL DURING FUMIGATING.
 
 UNQUOTE
 
 112
 ADDITIONALLY WE QUOTE BELOW NOTICE SENT YESTERDAY BY VESSELS' MOBILE AGENTS TO ADM MOBILE AGENTS.
 
 QUOTE
 SEPTEMBER 24, 1974
 
 113
 ON BEHALF OF OUR PRINCIPALS, OWNERS AND/OR OPERATORS OF THE M/S SOUTHWALL AND M/S ARIZONA, WE HAVE TO ADVISE YOU THAT YOUR PRINCIPALS, THE SUPPLIERS AND/OR SHIPPERS OF CARGOES OF BAGGED FLOUR BEING LOADED ONTO SAID VESSELS, WILL BE HELD LIABLE FOR ANY AND ALL LOSSES, DELAYS OR DAMAGES, BROUGHT ABOUT BY THEM AND/OR THEIR AGENTS HAVING RELEASED SAME FOR LOADING ON BOARD VESSELS POSSIBLY INFESTED WITH WEEVILS OR OTHERWISE NOT IN ORDER TO LOAD. WE MUST ADVISE THAT BOTH YOU AND YOUR PRINCIPALS WERE WELL AWARE THAT BOTH VESSELS ARE IN PORT AND HAVE BEEN LOADING FOR THE PAST SEVERAL DAYS AND NO ADVERSE CONDITIONS WERE REPORTED UNTIL LATE THIS PM.
 
 UNQUOTE
 
 114
 ON BEHALF OUR PRINCIPALS, THE EMBASSY OF BOLIVIA, WE REQUEST YOU ADVISE US AS SOON AS POSSIBLE REGARDING ARRANGEMENTS BEING MADE TO FUMIGATE THE VESSELS AS PER THE ABOVE TERMS AND CONDITIONS.
 
 
 115
 See 449 F.Supp. at 99. Within hours, ADM replied:
 
 RE: WHEAT FLOUR FOR ARIZONA AND SOUTHWALL
 
 116
 WE ARE CONTINUING TO DELIVER CLEAN FLOUR FOR LOADING ABROAD SAID VESSELS.
 
 
 117
 Following these written communications, a series of telephone conversations and meetings ensued between agents of ADM, Bolivia, and Stevenson. These informal communications continued throughout the time that there were problems with the flour, eventually including the problems of the Nedon as well as the Southwall and Arizona. Some of the informal communications were specifically described at trial; many others were only generally revealed.
 
 
 118
 Within days of the start of these informal communications, ADM, both informally and formally, made clear what was apparent from its reply telex of September 25: it had delivered only uninfested flour to the State Docks warehouses and under the F.A.S. term of the flour contracts "any and all claims with respect to insect infestation"[50] were not ADM's concern. Bolivia, on the other hand, clearly did not want to accept flour containing live infestation. Finally, Stevenson resolved the impasse by itself arranging for fumigation of the Arizona and Southwall flour. After informally telling ADM and Bolivia of this action, Stevenson then allowed the ships to depart for South America.
 
 
 119
 When the ships arrived in Arica, Bolivia inspected the cargoes, found live infestation, but nevertheless accepted the flour. As these events unfolded on October 14-15, the Nedon was loading in Mobile. From the informal communications around this period involving ADM and its agents it is easily inferable that Bolivia indicated that live infestation such as that found in the Arizona and Southwall violated ADM's contractual responsibilities and furthermore would be unacceptable if found in the Nedon flour. Supporting that inference is the fact that all parties were in "continuous communication" with one another from the time that infestation problems were found in Mobile. See Automated Controls, Inc. v. MIC Enterprises, Inc., 27 U.C.C.Rep. 661, 674 (U.S.D.Neb.1978), aff'd per curiam, 599 F.2d 288 (8th Cir. 1979).[51] In addition, Bolivia's actions were consistent with its communications, since it initially refused to allow the discharge of the Arizona and Southwall cargoes, mistakenly thinking that the breach of contract gave it the right to prevent the ships from unloading.
 
 
 120
 Upon discovery of the Nedon flour's infestation, Bolivia added to its informal communications another written one. On October 24, 1974, Bolivia (through its bank) telexed ADM that no further payments would be permitted under the "irrevocable" letter of credit. The reason stated to ADM was that "your . . . merchandise found contaminated from origin. . . ."[52] Finally, Bolivia formally rejected the Nedon flour on October 31, to which ADM, as before, replied that its responsibilities had ended as of the time of delivery of the flour to the State Docks warehouses.
 
 
 121
 From this review of the parties' course of conduct concerning the Arizona and Southwall flour, it is apparent that the District Judge was entitled to draw a number of inferences. First, viewing Bolivia's September 25 telex in light of the "not responsible" reply it elicited from ADM, and considering the other informal communications, it may be inferred that the telex made ADM aware: (i) of Bolivia's dissatisfaction with the flour containing live infestation and (ii) of Bolivia's position that the infestation breached the flour contracts. See Eastern Air Lines, supra, 532 F.2d at 979 (letters complaining of delays could be inferred by jury to constitute adequate notice). The telex certainly can be inferred to have encouraged compromise, even though ADM steadfastly refused to settle. But while the September 25 telex is significant, it alone cannot constitute adequate notice. Section 2-607(3)(a) is most sensibly read to require notification after acceptance,[53] while the telex was sent before Bolivia accepted the flour in Arica. Furthermore,
 
 
 122
 (e)ven though adequate notice may have been given at one point in the transaction, subsequent actions by the buyer may have dissipated its effect. The buyer's conduct, then, taken as a whole, must constitute timely notification that the transaction is claimed to involve a breach.
 
 
 123
 Id. at 978 (footnote omitted).
 
 
 124
 We find four aspects of the record which indicate that Bolivia gave proper notice after accepting the flour in Arica: (i) the fact that, as stated above, communications concerning the flour problems were ongoing; (ii) prior communications, including the September 25 telex, indicated Bolivia's staunch position with respect to live infestation; (iii) Bolivia's action in refusing to allow the flour to be discharged in Arica, an action consistent with a position that the contract had been breached; and (iv) Bolivia's October 24, 1974, telex stopping further letter of credit payments and asserting that the flour was contaminated when it left ADM's hands. From these facts and inferences, the District Judge was entitled to conclude that Eastern Air Lines' first policy of encouraging compromise was fulfilled, since ADM had full knowledge that the flour was infested and that Bolivia regarded live infestation as a breach of contract.
 
 
 125
 Similarly, the second policy of encouraging commercial good faith is fulfilled under the facts and permissible inferences of this case. Bolivia acted in good faith. There was nothing about its conduct that was unreasonable with respect to ADM, although the same may perhaps not be said with respect to Stevenson and the detention of the ships in Arica. For example, Bolivia complained to ADM in Mobile and again after the flour reached South America and was found "reinfested." Unlike the buyer in Eastern Air Lines, Bolivia did not try to continue its relationship with ADM; to the contrary, it rejected the Nedon flour and stopped payments under the letter of credit. Bolivia never gave ADM any assurances that ADM would not be liable. In contrast, ADM acted less reasonably. For example, the speed with which ADM declared that it had delivered uninfested flour suggests a lack of actual investigation into the condition of its deliveries. That ADM made its declaration recklessly and possibly with knowledge different from that it represented is moreover suggested by its immediate fumigation of the warehouse flour (although ADM now claims that it took that step solely to promote good customer relations).
 
 
 126
 We therefore have a situation converse to that in Eastern Air Lines. In the instant case, there is a factfinding, not a directed verdict, of adequate notice based on all the evidence. The notice encouraged compromise, notwithstanding ADM's adamant refusal to even consider doing so. And the buyer acted in commercial good faith in contrast to the seller's questionable conduct as compared to the reverse situation in Eastern Air Lines. We cannot say that the District Judge was wrong in finding that Bolivia gave adequate notice of breach to ADM under § 2-607(3)(a). Bolivia's claim for damages for the Arizona and Southwall flour is therefore not barred under the UCC's notice requirement.
 
 
 127
 (ii) The Contractual Notice Provision
 
 
 128
 The remaining aspect of the notice of breach issue is the contract provision requiring written notice to be sent within 10 days by registered mail and the forwarding of a sample of the nonconforming flour within 20 days. From our discussion of notice under § 2-607(3)(a), it is clear that Bolivia met only the ten-day time period requirement. What Bolivia clearly did not do wasgive notice by registered mail specifying the nature of the complaint. Moreover , the Ministry forwarded no sample of the non-conforming cargo as required in its contract with ADM.
 
 
 129
 449 F.Supp. at 128 (emphasis supplied). Since the contract states that the failure to comply with these two requirements bars recovery, we must decide whether the District Judge's refusal to enforce the words of the contract was proper.
 
 
 130
 "(P)arties may by agreement determine the standards by which the performance of (the Code's) obligations is to be measured if such standards are not manifestly unreasonable." UCC § 1-102(3).[54] Clearly, the contracts' additional notice requirements fall within this provision.[55]
 
 
 131
 Although the District Judge's refusal to give effect to the additional notice requirements is not extensively explained, we believe his refusal was based upon permissible equitable grounds,[56] specifically those included in the Code's waiver provisions. The combination of §§ 2-208(3)[57] and 2-209(4)[58] establishes that the parties' course of performance after execution of the contract can operate as a waiver of specific contractual provisions.[59] The reason for the Code's waiver provisions is well-stated by R. Nordstrom, supra, § 50, at 151 (emphasis supplied):
 
 
 132
 The Code rejects the notion that just because the parties have entered into a "contract" something magical has occurred which prevents any change of that contract without all of the elements of a new contract. The Code's concept of contract is that of a continuing relationship between the parties, a relationship which can be changed by them as they move from the negotiation stage through to complete performance.
 
 
 133
 The equitable nature of these provisions is revealed also by the Code's drafters:
 
 
 134
 Where it is difficult to determine whether a particular act merely sheds light on the meaning of the agreement or represents a waiver of a term of the agreement, the preference is in favor of "waiver" whenever such construction, plus the application of the provisions on the reinstatement of rights waived (see Section 2-209), is needed to preserve the flexible character of commercial contracts and to prevent surprise or other hardship.
 
 
 135
 Official Comment 3 to UCC § 2-208.
 
 
 136
 The conduct by ADM that we find significant concerns its reaction to Bolivia's September 25 telex complaining of infestation while the ships were still in Mobile. Like the later communications when the ships reached Arica, the September 25 telex (and ensuing discussions) were not in the "registered mail" form, nor followed by a sample, as required by the contracts. ADM's reply to the telex as well as its informal communications over the next few days, dealt with the substance of Bolivia's complaints and did not fault Bolivia for failing to comply with the contracts' notice requirements. ADM simply refuted the substance of Bolivia's complaints by stating that the flour supplied met contract specifications. Thus ADM's responses to Bolivia's initial complaints established a course of performance in which the registered mail and sample requirements of the contractual notice provision could be disregarded.[60]
 
 
 137
 Since ADM's response to Bolivia's initial complaints established a course of performance in which the registered mail and sample requirements of the contractual notice provision could be disregarded, when the second discovery of live infestation was made in Arica, that course of performance effected a waiver of the contracts' notice requirements. See UCC § 2-209(5).[61] Cf. City of Bedford v. James Leffel & Co., 21 UCC Rep. 1332 (U.S. 4th Cir. 1977) (estoppel). Since ADM's actions in Mobile operated as a waiver of the contractual requirements of notice, the District Judge was justified in concluding that the contractual notice provisions did not bar Bolivia's recovery against ADM.
 
 E. Breach Of Contract Damages
 
 138
 The District Judge awarded $325,960.51 to Bolivia for ADM's breach of warranty with respect to the Arizona and Southwall flour. This amount was computed by considering (i) the actual cost of fumigating, cleaning, and rebagging the flour and (ii) the amounts received when the salvaged flour was sold in the Government-controlled Bolivian market. 449 F.Supp. at 129-30 n.77.
 
 
 139
 "The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages in a different amount." UCC § 2-714(2); Murray v. Kleen Leen, Inc., supra, 41 Ill.App.3d at 444, 354 N.E.2d at 422. As discussed, ADM has failed to show that acceptance occurred in Mobile rather than in Arica. Because the bags of flour were specially labeled for the Bolivian market, to the extent that there are "special circumstances," those certainly favor using South American rather than Mobile market values. The appropriate measure of damages is therefore best established by comparison of market values at "the time and place of acceptance:" Arica.
 
 
 140
 Besides contesting the District Judge's determination of the point of acceptance, ADM argues that the award was too large. It specifically argues that deductions from the awards should have been made (i) for the deterioration of the flour during the period that Bolivia refused to let the ships unload and (ii) because of further deterioration caused by Bolivia's failure to care for the flour as it sat in the port of Arica. ADM's contentions misconstrue the process of computing damages. The District Judge's use of actual salvage costs and of Bolivian sale prices was only a method of approximating Arica market values as of the time of acceptance. See J. White & R. Summers, supra, § 10-2, at 309-10. Damages may be determined "in any manner (that) is reasonable." UCC § 2-714(1). Even assuming that the flour deteriorated somewhat after acceptance, the District Judge may well have made an offsetting, upward adjustment of the actual costs and receipts in order to estimate market value. Moreover, the District Judge was free to entirely discredit evidence of post-acceptance deterioration. We cannot say that the District Judge acted unreasonably in setting the amount of the damage award. Cf. Allen v. Seacoast Products, Inc., 623 F.2d 355, 365-66 (5th Cir. 1980). We therefore affirm the award of breach of contract damages, without change in the amount.
 
 
 141
 IV. Detention Of The Arizona and Southwall In Arica
 
 
 142
 The District Judge awarded Stevenson damages of $92,014.82 for 23 days detention of its vessels, the Arizona and Southwall, in the port of Arica. The actions of Bolivian officials were found to be the sole proximate cause of the inability of Stevenson to offload the flour from its ships. Bolivia challenges the detention award on procedural and on substantive grounds.
 
 
 143
 A. Procedural Challenge: A Late Counterclaim
 
 
 144
 With all of the complaints, answers, amended complaints, amended answers, cross claims, counterclaims, and amendments to even once-amended pleadings, which were filed by, between and against ADM, Bolivia, Stevenson, and various other interests, it is at first glance surprising that the parties did not early in the litigation exhaust every possible motion and pleading which the Federal Rules of Civil Procedure permit one party to hurl against another. Yet it was only late during the trial that Stevenson formally sought by moving to file a counterclaim against Bolivia to place the responsibility for detention of the Arizona and Southwall squarely upon Bolivia instead of ADM. Thereafter, several weeks passed and the parties concluded their presentation of evidence and made oral arguments to the Court. The District Judge decided to allow Stevenson to file its counterclaim. The parties' written proposed findings and briefs were then received, and the Judge began his deliberations. He decided to award Stevenson damages against Bolivia for the detention. Procedurally, Bolivia now contends that this judgment was improper: by allowing the filing of the counterclaim after the close of evidence but before judgment, the District Judge substantially prejudiced Bolivia and abused his discretion.
 
 
 145
 Bolivia's contention initially requires a somewhat detailed review of the conduct of this litigation. The case began as an in rem action by Stevenson against the Nedon cargo. ADM almost immediately made its claim to the cargo. Attempts to bring Bolivia into the fray were at first frustrated by a claim of sovereign immunity, but eventually Bolivia filed an answer on September 25, 1975. Since trial commenced five months later on February 17, 1976, Bolivia's late entry into the litigation necessarily limited the pre-trial discovery of Bolivian evidence. Difficulties were experienced because several Bolivian witnesses were in Bolivia and because a number of documents requested by ADM were not produced, despite the best efforts of Bolivia's counsel. Nonetheless, several Bolivian witnesses were deposed, with counsel for Stevenson as well as ADM and Bolivia almost always in attendance.
 
 
 146
 One of Bolivia's key witnesses was Sub-Secretary Landivar. As earlier described, Landivar made most of Bolivia's decisions regarding buying and transporting the flour involved in this litigation. ADM attempted to depose Landivar during December 1975. Bolivia moved for a F.R.Civ.P. 26(c) protective order because of Landivar's residence in Bolivia, assertedly outside of the Court's jurisdiction. From the record, it appears that the motion was never acted upon by the Court, however.[62] Consequently, ADM and Bolivia proceeded to trial without benefit of Landivar's knowledge and with only a somewhat limited number of Bolivian documents involving Landivar's decisions. Bolivia, the last of the three parties to present its evidence, scheduled Landivar as its fourth-to-last witness.
 
 
 147
 Until Landivar's appearance near the end of trial, the parties tried the detention issue by attempting to shift liability in a roundabout manner. Stevenson tried its case based on evidence indicating that Arica officials justifiably prevented discharge out of fear of contaminating their port. Thus Stevenson attempted to show that the action was a foreseeable consequence of ADM's fault in supplying infested flour, making ADM liable. ADM, in turn, attempted to prove itself faultless by showing that the flour was not infested upon arrival in Mobile, and, alternatively, to shift the blame to Bolivia by showing that it was responsible for the actions of the Arica officials. Finally, Bolivia attempted (i) to prove that ADM was incorrect in alleging that Bolivia was behind the actions of the Arica officials; and, alternatively, (ii) to shift liability full-circle back to Stevenson by trying to show that Stevenson did not inform Bolivia of the infestation before the ships left for South America and failed properly to clause the bills of lading. Tinkers-to-Evers-to-Chance.
 
 
 148
 Given the Stevenson-to-ADM-to-Bolivia contentions concerning the detention, Bolivia not surprisingly brought forth several witnesses to explain the part it had played in the detention.[63] One of these was Landivar. During the course of Landivar's testimony on March 18, 1976, ADM's counsel interrupted for a voir dire examination. In the course of the examination, Landivar readily revealed that he had a number of documents relating to his testimony in his coat pocket. Among these was a telegram he had sent to Bolivia's Customs Agents in Arica on October 15, 1974:
 
 
 149
 . . . CONFIRMING MY INSTRUCTIONS OF YESTERDAY ABOUT ARRIVAL LOTS 1645 SOUTHWALL 4056 ARIZONA SINCE BOTH LOTS ARE INFESTED THEY MUST BE REJECTED THROUGH SAME VESSELS STOP-WE ARE TRANSMITTING CONTEXT TO SHIPPING COMPANY STEVENSON LINES STOP-GENERAL MANAGER HOME ASSURANCE IS GOING THERE TO COMBINE THIS OPERATION.
 
 
 150
 This telegram and several other items from Landivar's coat pocket had not been previously revealed to ADM or Stevenson (nor to Bolivia's own counsel), in spite of ADM's pre-trial discovery request for all relevant documents.
 
 
 151
 The next day, on March 19, Stevenson's counsel stated in open court that because of Landivar's unexpected testimony and "coat pocket" telegram, a counterclaim against Bolivia for the detention would be filed. Landivar then resumed testifying and the trial was reset until April 19, 1976. On April 2, Stevenson filed the promised counterclaim against Bolivia. Bolivia opposed the filing of the counterclaim, contending that it was prejudicial and untimely.
 
 
 152
 When trial resumed on April 19, the filing of Stevenson's counterclaim was briefly discussed. The District Judge commented, "I don't see that this amendment changes the lawsuit greatly," and "I don't think it is going to change the question of the witnesses one way or another." The Judge nonetheless reserved his ruling on the counterclaim. Two days later, on April 21, 1976, testimony ended. On August 4, 1976, the Judge's reserved ruling was filed, allowing the counterclaim to be filed. Briefs and proposed findings were received five days later. On September 16, 1976, the Judge's findings of fact and conclusions of law were announced.
 
 
 153
 The thrust of Bolivia's argument is that because of the District Judge's delay by not ruling on the counterclaim until after the close of evidence Bolivia did not know whether any rebutting evidence was necessary, dared not present any for fear of impliedly agreeing to the counterclaim, and therefore was severely prejudiced in defending against the counterclaim. In other words, Bolivia argues that it did not "squarely recognize" until after the close of evidence that the conduct of its agents with respect to the ships' detention was to be an issue. Bolivia argues that the grant of the counterclaim on that issue fails to meet the requirements of F.R.Civ.P. 15(b):
 
 
 154
 Amendments to Conform to the Evidence. When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues. . . .
 
 
 155
 Bolivia then refers to an eminent authority, which states that "it cannot be fairly said that there is any implied consent to try and issue where the parties do not squarely recognize it as an issue at trial." 3 Moore's Federal Practice P 15.13(2) (2d ed. 1979). Lastly, Bolivia reinforces its position by reliance on a host of decisions refusing to allow Rule 15(b) amendments.[64]
 
 
 156
 Although Rules 15(a) and 13(f) may be equally appropriate in this case,[65] Rule 15(b)'s rubric governing amendments to issues tried by "implied consent" of the parties has been widely interpreted as essentially equivalent to requiring that the losing party not be prejudiced by the amendment.[66] Discussing Rule 15(b), 3 Moore's Federal Practice, supra, P 15.13(2), states: "The test should be whether the defendant would be prejudiced by the implied amendment. . . . In terms of the Rule, where such prejudice is found it can be said that no implied consent exists." Since under Rules 15(a) and 13(f) the Court should not grant leave to amend (or to add a counterclaim) where undue prejudice will result,[67] the standards of all three of these Rules coalesce so far as assertions of prejudice, as here, are involved.[68]
 
 
 157
 Our review of Bolivia's argument is of course limited to a determination of whether the District Judge abused his discretion. Foman v. Davis, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222, 225 (1962); Henderson v. United States Fidelity & Guaranty Co., 620 F.2d 530, 534 (5th Cir. 1980). We have also recognized that "(t)he argument for allowing amendment is especially compelling when, as here, the omitted counterclaim is compulsory." Spartan Grain & Mill Co. v. Ayers, supra, 517 F.2d at 220 (citing 3 Moore's Federal Practice, supra, P 13.33).[69] On the other hand, it is not often that amendments are allowed after the close of evidence, since the opposing party may be deprived of a "fair opportunity to defend and . . . (to) offer any additional evidence . . . ." Monod v. Futura, Inc., 415 F.2d 1170, 1174 (10th Cir. 1969).[70] This is not to say, of course, that the time at which a counterclaim is requested or is permitted to be added is necessarily determinative. 6 C. Wright & A. Miller, supra, § 1488 at 436. What matters is whether the District Judge's balance of equitable considerations, including prejudice to the party opposing the added counterclaim, represented a proper exercise of discretion.
 
 
 158
 Evaluating first the aspect of prejudice, the fact that Bolivia had adequate opportunity to and did in fact submit written material to the District Judge concerning the legal issues raised by Stevenson's counterclaim suggests some lack of prejudice to Bolivia. In addition, Stevenson warned Bolivia during trial and while Landivar and other relevant witnesses were available that a counterclaim would be and physically actually was filed. Later, but again before the close of evidence, the District Judge indicated his inclination to allow addition of the counterclaim, although he did not formally so rule at that time. Nonetheless, Bolivia argues that it was prevented from presenting additional rebutting evidence because of the possibility that it would be impliedly consenting to the proposed counterclaim. This argument is, however, weakened by two further considerations. One is that the District Judge's finding against Bolivia was based in effect on a finding that any possible, additional actions of Arica port officials could only have been insignificant compared to Landivar's supervening actions. 449 F.Supp. at 105 & n. 30. And in order to refute that finding, Bolivia would have had to impeach the testimony of its own witness, Landivar.
 
 
 159
 Second, and most importantly, Bolivia itself put on a great deal of evidence concerning the cause of the detention, even prior to Stevenson's announcement that it would counterclaim. Bolivia brought forth that evidence in order to defend against ADM's attempts to shift the blame for the detention. ADM, in turn, sought to place liability on Bolivia because of the possibility that Stevenson would succeed in showing that ADM supplied bad flour and thereby caused the detention. The detention issue at least who was responsible for it operationally, not who is legally responsible for the consequences was therefore one of the issues in the case from the beginning of trial. When an issue is recognized as present in a case, even in slightly altered form, the opposing party cannot be greatly prejudiced. Jurinko v. Edwin L. Wiegand Co., 477 F.2d 1038, 1045-46 (3rd Cir. 1973); DeHaas v. Empire Petroleum Corp., supra, 435 F.2d at 1228-29. We conclude that Bolivia was not prejudiced to any significant extent.
 
 
 160
 In addition to the question of prejudice to Bolivia are the countervailing equitable considerations that caused the late filing of the counterclaim in the first place: Landivar's unexpected testimony and his coat pocket production of the telex. While there is some room for arguing that more diligent pursuit of Landivar's deposition might have revealed his testimony prior to trial, there is no doubt that ADM's request for production of documents should have brought forth the coat pocket telex.[71] In not producing the telex Bolivia was grossly negligent if not in outright violation of the rules of discovery. F.R.Civ.P. 26.[72] It is certainly inequitable for Bolivia to argue that it was prejudiced by Stevenson's counterclaim when Bolivia's own conduct prevented the discovery at an earlier date of information which would have prompted an earlier counterclaim. Bolivia, however, appears to argue that its discovery violation is irrelevant since only ADM, not Stevenson requested the documents. We disagree. Absent a very rare sort of F.R.Civ.P. 26(c) protective order, Stevenson would have had access to all documents discovered by ADM from Bolivia. Thus, there is a sufficient causal connection between Bolivia's failure to comply with ADM's production request and Stevenson's late-filed counterclaim.
 
 
 161
 Because of a lack of prejudice to Bolivia and Bolivia's inequitable contribution to its own predicament, the District Judge's assessment of the equities was hardly an abuse of discretion. Of course, it would have been far better if the Judge had acted on Stevenson's motion for leave to file its counterclaim before the close of evidence, for then it would have been abundantly clear to Bolivia that additional evidence not that any was available could be presented. But in this situation, the Judge's delay was harmless and an acceptable if not perfect exercise of his discretion. We consequently find no procedural error.
 
 
 162
 B. Substantive Challenge: Issuance Of Clean Bills Of Lading
 
 
 163
 Bolivia argues that Stevenson was partly at fault for the detention and that damages should therefore be apportioned under Reliable Transfer 's[73] comparative fault principle.[74] Stevenson's fault allegedly stems from its issuance of clean bills of lading for the Arizona and Southwall flour, although Stevenson knew that the flour had, at least prior to fumigation, contained live infestation.[75] We conclude that Stevenson was not at fault by issuing clean bills of lading and therefore do not reach the question of whether Reliable Transfer 's principle extends to detention damages.
 
 
 164
 A brief explanation of the contractual relationships between the instant parties is helpful to an understanding of our discussion. In many transactions involving carriage by sea, the seller of the goods arranges transportation with an ocean carrier. The seller, not the buyer, is the shipper and enters into the booking note with the carrier. The carrier then delivers the goods to the consignee at the destination port specified by the shipper. In this case, however, the buyer, Bolivia, arranged for transportation and is both the shipper and the consignee. Stevenson, of course, is the carrier. The booking note and bill of lading (which is incorporated by reference) define the rights and obligations of Stevenson and Bolivia. Those documents expressly state that COGSA's provisions apply to the transportation of the flour.
 
 
 165
 Among COGSA's provisions is the requirement that
 
 
 166
 After receiving the goods into his charge the carrier, or the master or agent of the carrier, shall, on demand of the shipper, issue to the shipper a bill of lading showing among other things-
 
 
 167
 (c) The apparent order and condition of the goods: Provided, That no carrier, master, or agent of the carrier, shall be bound to state or show in the bill of lading any marks, number, quantity, or weight which he has reasonable ground for suspecting not accurately to represent the goods actually received, or which he has had no reasonable means of checking.
 
 
 168
 46 U.S.C.A. § 1303(3). This provision does not, however, indicate the consequences of issuing a false bill of lading. For contracts of public carriage, the Federal Bills of Lading (Pomerene) Act of 1916, 49 U.S.C.A. §§ 81-124, states:
 
 
 169
 Liability for nonreceipt or misdescription of goods
 
 
 170
 If a bill of lading has been issued by a carrier or on his behalf by an agent or employee the scope of whose actual or apparent authority includes the receiving of goods and issuing bills of lading therefor for transportation in commerce among the several States and with foreign nations, the carrier shall be liable to
 
 
 171
 (b) the holder of an order bill, who has given value in good faith, relying upon the description therein of the goods, or upon the shipment being made upon the date therein shown, for damages caused by the nonreceipt by the carrier of all or part of the goods upon or prior to the date therein shown, or their failure to correspond with the description thereof in the bill at the time of its issue.
 
 
 172
 Pomerene Act § 6, 49 U.S.C.A. § 102. But the contract in this case was one of private rather than public carriage.[76] The Pomerene Act therefore does not apply. Neither is Bolivia seeking recovery against Stevenson for pre-shipment defects in the cargo, as such.[77] Thus Bolivia does not seek the relief which § 6 of the Pomerene Act addresses.
 
 
 173
 Instead, Bolivia's argument is necessarily predicated on general maritime principles which underlie § 6 of the Pomerene Act. The admiralty has recognized for almost 200 years that false bills of lading work an injustice on unknowing holders, and potentially impede maritime commerce. A well-known decision by District Judge Woolsey discusses that history and observes:
 
 
 174
 A bill of lading is a document of dignity, and courts should do everything in their power to preserve its integrity in international trade for there, especially, confidence is of the essence.[78]
 
 
 175
 Many decisions have condemned the carrier that issues a clean bill of lading knowing that the goods were not in "good order and condition" when received.[79] But the cases, like § 6 of the Pomerene Act, apply to a fact pattern different from that in the instant case. That usual fact pattern involves the delivery of goods by the shipper in apparent bad order and condition. Nonetheless, the carrier then issues a clean bill of lading, often because of pressure exerted by the shipper.[80] Often the carrier obtains a letter of indemnity from the shipper.[81] Relying on the description in the bill of lading, the consignee then takes a bill of lading and pays the shipper for the goods. The goods are, of course, then found to be damaged, and the holder of the bill of lading sues the carrier. Having relied on the bill of lading, the holder is then permitted to recover for preshipment damage against the carrier, even though the carrier did not cause that damage.
 
 
 176
 In the instant case the situation is somewhat different because Bolivia's claim does not relate to pre-shipment damage. Nonetheless, the carrier should be responsible for all consequences proximately resulting from the issuance of a misleading bill of lading. A bill of lading's integrity must be jealously guarded. Thus the general maritime law's proscription against issuing false bills of lading can apply where detention damages rather than pre-shipment cargo damage is involved.
 
 
 177
 Bolivia has failed, however, to establish one of the elements necessary to a finding of fault under the above principles: reliance on the allegedly false bill of lading. We do not doubt that in the usual situation in which the consignee has no knowledge of the condition of the goods that clean bills of lading for the flour would have been misleading.[82] But Bolivia, at least through its agent St. John,[83] was fully aware of the infestation and fumigation of the cargoes. Indeed, all of the parties' agents were in nearly continuous communication with one another concerning those cargoes. In spite of its full knowledge of the situation, Bolivia made no attempt to stop the ships from leaving Mobile. Bolivia therefore could not have relied upon the description of the flour contained in the bills of lading.[84]
 
 
 178
 Without reliance, the holder of the bill of lading cannot have been harmed by any false description of the goods. The cases accordingly hold that the false bill of lading principle does not apply where the holder of the bill of lading did not rely on the description.[85] In Freedman v. The Concordia Star, 250 F.2d 867, 1958 A.M.C. 1308 (2d Cir. 1958), for example, a judgment against the carrier was reversed because the buyer examined the shipment of animal skins and discovered the damage prior to paying the consignee for the clean bill of lading. See also Portland Fish Co. v. States S.S. Co., supra, 510 F.2d at 633, 1975 A.M.C. at 400-01; Dal International Trading Co. v. The SS Milton J. Foreman, 171 F.Supp. 794 (E.D. N.Y. 1959).
 
 
 179
 Since Boliva cannot show any reliance on the description of the flour in the bills of lading, Stevenson's claim was not barred by the issuance of clean bills of lading. The District Judge was therefore correct in holding Bolivia solely responsible for the detention of the Arizona and Southwall in Arica.
 
 
 180
 V. Recovery Of Pre-Paid Freight And Associated Damages For
 
 
 181
 The Nedon: Validity Of The Lien, Reasoned Judgment
 
 
 182
 In Loading, And Asserted Computational Error
 
 
 183
 The District Judge awarded Stevenson its freight for the Nedon, plus detention damages and necessary expenses, totaling $310,067.25.[86] Damages associated with the detention of the Arizona and Southwall are not at issue here. Stevenson was found to have a valid lien on the Nedon cargo. Since the cargo was released to ADM under Supp. Rule E(5), F.R.Civ.P., payment of the judgment fell on ADM, the claimant. The freight component of that award was based on the pre-paid freight provision of the booking note and bill of lading, reduced, however, by the amount of the freight attributable to the third day of loading. The reason for the reduction was that Stevenson was found to have exercised a lack of "reasoned judgment" in continuing to load the Nedon after the second day of loading. ADM asserts four points of error[87] and Stevenson one in connection with the Nedon freight and detention award.
 
 A. Validity Of The Lien
 
 184
 In the District Court ADM belatedly argued that the lien on the Nedon flour was invalid because Stevenson time-chartered the Nedon, making the owner of that ship the proper party to institute this in rem action. The District Judge considered and rejected that argument. 449 F.Supp. at 120. ADM does not reassert that argument on appeal. Rather, ADM's new argument attacking the validity of the lien is based on Goodpasture, Inc. v. M/V Pollux, 602 F.2d 84 (5th Cir.), reh. and reh. en banc denied, 606 F.2d 321 (1979), which was decided on September 10, 1979. In November 1979 ADM filed a letter in response to the Clerk's standard request for information about intervening decisions but did not mention this argument or cite Goodpasture. It was not in fact until the last few seconds of oral argument before this Court, in his rebuttal argument following those of Stevenson and Bolivia, that ADM's counsel first presented his Goodpasture argument.
 
 
 185
 Notwithstanding that the Goodpasture issue is not substantially related to the lien issue tried below (which was itself belatedly raised) and was raised at almost the last possible moment in this appeal, we choose to exercise our discretion and decide the issue. We do so because the issue is entirely a legal question and does not require the development of additional facts. Goodpasture was decided close to oral argument and apparently did not come to ADM's counsel's attention until late in the appeal. We decide in any event that the lien was valid and, under all the circumstances, we ought not to ignore the issue. See Evans v. Triple R Welding & Oil Field Maintenance Corp., 472 F.2d 713, 716 (5th Cir. 1973); Higginbotham v. Ford Motor Co., 540 F.2d 762, 768 n. 10 (5th Cir. 1976).
 
 
 186
 The facts in Goodpasture are strikingly similar in all but one crucial respect to those of this case. There, grain was sold by a seller to a buyer, with payment arranged by irrevocable letter of credit requiring presentation of various documents including a bill of lading. The buyer acted as shipper and contracted with a carrier for ocean carriage, agreeing that part of the freight would be paid in advance. The carrier presented a ship which was then loaded with the grain. The buyer did not make the agreed advance payment, however, and the carrier refused to issue a bill of lading to the seller. Subsequently, the carrier asserted a maritime lien for its freight against the cargo of grain. Reversing the District Court, we held in Goodpasture that the carrier had no lien against the cargo. The reasoning was that under the contract between the buyer and seller, it was "understood that title to the grain was not to pass . . . until payment was made under the . . . letter of credit." 602 F.2d at 85 (emphasis added). The carrier having refused to issue the bill of lading, payment was never made, and "title to the grain never passed." Id. at 86. The seller therefore retained title to the cargo. The carrier's claim was, however, based on a contract right between it and the buyershipper, not the seller. The carrier therefore had no contractual claim against the seller. Lacking a contractual claim against the titleholder of the cargo, we concluded that the carrier could not assert a lien against the cargo.
 
 
 187
 Stevenson's lien is entirely different from that in Goodpasture, however. The crucial difference is that ADM's contracts with Bolivia passed title to Bolivia upon delivery to Stevenson. Payment under the letter of credit was not required to pass title. The contract stated "(d)elivery of goods by SELLER to the carrier at point of shipment shall constitute delivery to BUYER. . . ." Section 2-401 of the UCC provides that (emphasis supplied):
 
 
 188
 Insofar as situations are not covered by the other provisions of this chapter and matters concerning title become material the following rules apply: . . .
 
 
 189
 (a) . . . . title to goods passes from the seller to the buyer in any manner and on any conditions explicitly agreed on by the parties.
 
 
 190
 (b) Unless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods, despite any reservation of a security interest and even though a document of title is to be delivered at a different time or place; and in particular and despite any reservation of a security interest by the bill of lading
 
 
 191
 (1) if the contract requires or authorizes the seller to send the goods to the buyer but does not require him to deliver them at destination, title passes to the buyer at the time and place of shipment; . . .
 
 
 192
 Thus, under the contracts in this case and the applicable UCC provisions, Bolivia took title to the flour when it was physically delivered to Stevenson-even though Bolivia had not yet "accepted" and though ADM retained the risk of loss.[88] Obviously, the flour was physically delivered to Stevenson at least by the time that it was loaded aboard the Nedon.[89] Thus Stevenson's contractual claim against Bolivia for freight is in perfect congruence with Bolivia's possession of title to the cargo, so that Stevenson's lien is distinguishable from that in Goodpasture. In fact, the negative implication of Goodpasture is that Stevenson's lien is therefore valid. We therefore find that ADM's belated reliance on Goodpasture is unavailing.
 
 B. The Reasoned Judgment Rule
 
 193
 The concept of reasoned judgment as it relates to a carrier's loading of cargo is one of first impression for this Court. The District Judge relied on a recent adaptation of the concept by our brothers (and now sisters) of the Court of Appeals for the District of Columbia. In Orient Mid-East Lines, Inc. v. Cooperative for American Relief Everywhere, Inc., 410 F.2d 1006, 1969 A.M.C. 1658 (D.C. Cir. 1969), that Court considered a situation factually different from the instant case. There, the carrier continued to load its ships in the face of information that the St. Lawrence seaway would soon close because of ice. The ships were in fact trapped in the Great Lakes when the ice closure occurred. The carrier then sued the shippers for overwinter storage charges and for "second freights" compensation for delivering the cargo after the Seaway reopened.
 
 
 194
 The Orient Court affirmed the judgment of the District Court that the carrier failed to use reasonable judgment in not sending its ships out through the Seaway before the ice closure. The Court construed the bill of lading's storage fee and second freight provisions impliedly to contain a condition that the carrier exercise reasonable judgment. The Court held that the carrier lost its contractual right to storage fees and second freights because it had unreasonably ignored repeated warnings that the Seaway was about to close. The reasoned judgment rule formulated by Orient was the following:
 
 
 195
 there is a common standard of conduct prescribed if a carrier is to be afforded the protection of the exculpatory provisions. The Court finds that standard to be that to afford itself the protection of the exculpatory clauses of the bills of lading the carrier must exercise reasonable judgment under the circumstances existing and reasonably foreseeable at the time the judgment is made. In other words the exculpatory clauses do not confer a license to disregard the likely or the obvious.
 
 
 196
 410 F.2d at 1008, 1969 A.M.C. at 1661 (quoting the District Court opinion, 284 F.Supp. at 43).
 
 
 197
 The Orient formulation does not spring from fallow ground. Without tracing the full extent of its roots, the reasoned judgment rule dates to at least The Styria v. Morgan, 186 U.S. 1, 22 S.Ct. 731, 46 L.Ed. 1027 (1902). There, the carrier discharged a cargo of sulphur bound for America, which had just been loaded in Sicily, when it learned of the outbreak of war between America and Spain and that sulphur was on the Spanish "enemy's contraband list." The carrier was held to have exercised reasoned judgment in discharging the cargo, even though soon afterwards Spain exempted sulphur from the contraband list.[90]
 
 
 198
 These cases, whatever their differences, at least agree that it is necessary to determine the amount of knowledge which the carrier had or should have had as of the time of loading. Of course this is a factual determination well-protected under F.R.Civ.P. 52(a) unless induced by a misunderstanding of the applicable law.
 
 
 199
 Stevenson argues that the reasoned judgment rule has been used only in cases where the ship's ability to make its voyage was in doubt. It argues that matters relating to the voyage-for example, navigation and scheduling-are peculiarly within the knowledge of the carrier. By comparison, it urges the carrier has no duty to look inside packaged goods, nor the knowledge of whether the goods comply with the contract. In this case, concern centered around the goods, not the dangers of the voyage. Based on that distinction, Stevenson asserts that the reasoned judgment rule should not be extended to this case.
 
 
 200
 The District Judge was correct in applying the reasoned judgment rule to Stevenson's loading of the Nedon.[91]
 
 
 201
 ADM and Stevenson also challenge the District Judge's application of the reasoned judgment rule to the facts. Stevenson argues that it exercised reasoned judgment even on the third and last day of loading. ADM argues that Stevenson did not exercise reasoned judgment even on the first and second days, as well as the third day, of loading. The District Judge considered all of the factual arguments now pressed by the parties and decided that information obtained and decisions made by Stevenson on the evening of the second loading day, October 16, 1974, marked a significant change in circumstances. Because of the events of that evening, the District Judge found that Stevenson continued loading the Nedon in spite of the likely cancellation of the voyage. 449 F.Supp. at 107-08. Stevenson was therefore awarded only that portion of the prepaid freight and other damages attributable to the first and second days, not the third day, of loading.
 
 
 202
 The District Judge's largely factual finding is supported by substantial evidence. The results of tests of the Nedon -bound flour were communicated to Stevenson on the evening of October 16. Those results were the first definite indication that something was amiss with the Nedon flour. In addition, Stevenson decided that evening that the ship would not sail immediately.[92] Nor has Stevenson satisfactorily explained why it did not at least telephone Bolivian officials or agents of Bolivia, apprise them of the available facts, and ask whether loading should be discontinued until there was further investigation. In all, the District Court could conclude that Stevenson's conduct following the events of the evening of October 16 is more consistent with a desire to obtain prepaid freight, by completely loading the Nedon, than with a reasoned judgment that the voyage was likely to be completed. The balance struck by the District Judge was therefore not clearly erroneous.[93]
 
 C. Claim Of Computational Error
 
 203
 ADM concedes that the method for calculating damages due to the detention of the Nedon in Mobile was correct, but asserts that the District Judge failed to deduct enough days when computing its award.[94]
 
 
 204
 The formula[95] used by the District Judge nowhere challenged by either ADM or, more significantly, Stevenson is of questionable correctness. Unopposed as it was, what it amounted to was the District Judge's effort to figure the profit lost by Stevenson during the 67 days (plus) delay. As the Judge's method of calculation assumed a voyage which never occurred, since the cargo was discharged, and was necessarily a reasoned estimate, we do not think that, at this stage, we should intercede to make a specific money adjustment. We do not find the Judge's conclusion clearly erroneous.
 
 
 205
 VI. ADM's Claims Against Stevenson For Care Of The Cargo
 
 
 206
 Proceeding as a third party beneficiary of the shipping contract between Bolivia and Stevenson,[96] ADM asserts error in the District Judge's conclusions that Stevenson fulfilled its duties to "properly and carefully . . . handle, . . . keep, (and) care for . . . the goods carried." 46 U.S.C.A. § 1303(2). ADM first asserts that Stevenson's duties began when the flour arrived at the State Docks warehouses, not at ship's tackle as the District Judge found. If its duties began prior to loading, then ADM argues that Stevenson should have been found at fault in caring for the flour while it was in the warehouses. Beyond that, ADM argues that the District Judge erred in failing to hold Stevenson liable for the deterioration of the Nedon flour after it was loaded.[97]
 
 
 207
 A. When Did Stevenson's Duties[98] Begin?
 
 
 208
 Several provisions of the booking note[99] and Stevenson's usual bill of lading[100] concern the point at which Stevenson agreed to take responsibility for the care of the flour. These provisions required Stevenson to take responsibility at the time that the flour was loaded aboard its ships,[101] but they also permitted Stevenson to take responsibility at an earlier point. Without deciding whether Clause 12 of the usual bill of lading, see note 100 supra, effectively or permissibly disclaimed liability where acceptance occurs at a point before loading, the District Judge decided that Stevenson had not in fact taken responsibility for the flour until it was at ship's tackle. 449 F.Supp. at 122. See also 449 F.Supp. at 121 n.60. ADM attacks that conclusion for two reasons.
 
 
 209
 ADM relies on evidence that seems to conflict with the Judge's finding. First, when the flour arrived at the warehouses, Stevenson's local agents signed the Alabama State Docks receipts given to the railroad. The signing of the receipts suggests that Stevenson took full responsibility for the flour after that point. In addition, Item 52 of the State Docks tariff provides:
 
 
 210
 Alabama State Docks will not be responsible for loss of, or damage to or for delay to freight or cargo on its wharves, in its warehouses, transit sheds or in the open caused by or resulting from . . . weevils or other insects, . . . .
 
 
 211
 During the period of free time allowed or while on wharf demurrage cargo in transit sheds, shipside warehouses, or in open areas at shipside is in the custody, care and control of, and full responsibility therefore shall be assumed by, the vessel or its agents.
 
 
 212
 Although that provision is only dispositive of the allocation of responsibility between Stevenson and the State Docks, it too suggests that Stevenson took responsibility from ADM for the flour as of the time that it arrived at the warehouses.
 
 
 213
 Contrary to ADM's evidence is a substantial body of opposing evidence, however. For example, after the flour arrived at the warehouses, Superintendence, the agent of ADM, undertook a number of responsibilities in connection with the flour. Superintendence used fork lifts and hired laborers to move the flour around the warehouses. It test weighed, inspected, and sampled the flour. Superintendence was hired by ADM, and never attempted to obtain consent to deal with the flour from Stevenson. ADM twice authorized Superintendence to fumigate infested lots of flour stored in the warehouses. In addition, for the Nedon loading Superintendence provided written assurances that the flour was not infested. These facts certainly support a finding that ADM continued its custody of the flour while the flour was in the warehouses.[102]
 
 
 214
 Recognizing that we might not be fully persuaded by its view of the evidence, ADM also attempts to disassociate itself from Superintendence, which performed most of the acts suggesting that Stevenson did not take custody of the flour in the warehouses. The attempt fails, however. As stated, Superintendence was hired by ADM, not Stevenson; it fumigated flour at ADM's direction; and it issued written releases for the Nedon flour. These facts are enough to support a finding that Superintendence's actions are attributable to ADM. Cf. Alabama Power Co. v. Pierre, 236 Ala. 521, 183 So. 665 (1938).
 
 
 215
 In sum, it is plain that substantial evidence supports a finding that the contract as intended and performed by the parties allocated responsibility for the flour to Stevenson only as of the time that the flour was within reach of ship's tackle. The District Judge was not erroneous in finding that the flour was not in Stevenson's custody while in the warehouses. Thus the only remaining aspect of ADM's attempt to place cargo responsibility on Stevenson concerns the Nedon flour after it was loaded.[103]
 
 
 216
 B. Stevenson's Care Of Flour After Loading Aboard The Nedon
 
 
 217
 COGSA sets out a framework for establishing the duties of a carrier with respect to its cargo. The central aspect of that framework is a "ping pong game of burden-shifting," in which the burden of proof shifts back and forth between the parties in order to encourage them to produce whatever evidence is within their command. See W. Tetley, supra, at 47-55. The initial burden is on the party complaining against the carrier, here ADM, to show a prima facie case of both delivery of the goods to the carrier in good condition and outturn by the carrier in damaged condition. If that is shown, the burden shifts to the carrier to show that the damage was caused by one of the COGSA exceptions set out in 49 U.S.C.A. §§ 1304(2)(a)-(q). That shown, the burden shifts back and the carrier's negligence must be shown to have contributed to the damage. Finally, the carrier bears the final burden of separating the portion of the damage due to a COGSA-excepted cause from that resulting from its own negligence. See Schnell v. The Vallescura, 293 U.S. 296, 55 S.Ct. 194, 79 L.Ed. 373, 1934 A.M.C. 1573 (1934) (Harter Act decision); Nitran, Inc. v. M/V Cretan Life, 599 F.2d 1359, 1373 (5th Cir. 1979); W. Tetley, supra.
 
 
 218
 We have applied COGSA's framework in no less than four decisions involving insect damage to flour. In two, the shippers proved that the flour delivered to the carriers was free of infestation.[104] Thus, plaintiffs sustained their initial burden of proof and the process of burden-shifting ensued. In this case, however, it is now judicially determined that the flour was received by Stevenson in an infested condition. Accordingly, ADM never proved a prima facie case and the burden-shifting process never began. Exactly this type of situation was confronted in our other two flour infestation decisions. Of those two, United States v. Lykes Bros., S.S. Co., 511 F.2d 218, 1975 A.M.C. 2244 (5th Cir. 1975), is the controlling precedent.[105]
 
 
 219
 Lykes involved a shipment of flour infested with flour beetles prior to receipt by the carrier, as here. The flour was, however, stowed in the same hold as some animal feed which might also have been infested. Just before departure, a strike broke out, which lasted for six weeks, and which kept the ship in port. Inspections of the flour by the carrier on a weekly basis did not reveal any problem until the fifth week. At that time, live infestation in the flour was found, but the carrier waited another week before sending that information to the shipper by means of the regular mail. Two weeks after sending the letter, having heard nothing from the shipper, the carrier nevertheless decided to fumigate the flour. The ship then departed. On arrival in Poland, however, the flour was found totally infested.
 
 We held, first, that:
 
 220
 the District Court correctly concluded Shipper failed to make out a prima facie case. However, we do not agree that ends the matter. It simply means Shipper cannot rely on the difference between the cargo's condition when delivered to Carrier and that at outturn to discharge its burden of proof.
 
 
 221
 COGSA § 3(2), 46 U.S.C.A. § 1303(2) obligates Carrier to "properly and carefully load, handle, stow, carry, keep, care for, and discharge the goods carried." There is nothing in the statute which relieves that obligation. COGSA § 4, 46 U.S.C.A. § 1304, enumerates various instances in which carriers are not liable to their shippers, but none of them excuses the carrier from the duty imposed by § 3. Shipper's failure to make out a prima facie case, however, imposes upon it the burden of proving any damage to the cargo resulted from a breach of that duty. Further, we affirm the District Court's holding that Shipper was entitled to no more in the way of cargo-care than the shipper of any other load of flour. Cf. Aunt Mid, Inc. v. Fjell-Oranje Lines, 7 Cir., 1972, 458 F.2d 712.
 
 
 222
 511 F.2d at 223-24, 1975 A.M.C. at 2251 (footnote omitted). We then remanded the case to the District Court with specific instructions for the determination of whether the carrier met his continuing obligation to care for the infested flour.
 
 
 223
 Since Stevenson discovered the infestation of the Nedon flour at the time of loading, the first two of our instructions on remand in Lykes are clearly not applicable. Two of the remaining Lykes instructions are at least facially applicable to the instant case, however:Third, the Court should determine in the light of a factual record what a reasonable, prudent carrier, discharging its § 3(2) duty, would have done once it knew of the infestation, and at the time it should have known of it. Fourth, Shipper is obligated to prove, by a preponderance of the evidence, what damage was actually caused beyond that which would have resulted from the defective condition existing in the flour at the time of its delivery to Carrier. The fourth inquiry should be made in the context of the rule stated by the District Court, and affirmed by us, that Carrier (assuming a strike-less voyage) was not obligated to provide onboard treatment beyond the normal stowage due a shipper with flour in actual "best-possible" condition who does not specify special treatment.
 
 
 224
 Neither should the District Court feel obligated to reconsider its ruling on Carrier's eligibility for the strike exception. Thus, the fourth inquiry should include a determination of whether or not any reasonably feasible treatment would have saved the cargo, given both the strike and the delivery-condition.
 
 
 225
 Id. at 225, 1975 A.M.C. at 2253. The fourth instruction in Lykes was concerned with the damage due to the presence of the potentially infested animal feed and strike-related damage, for which the carrier's liability was excepted under COGSA. In the instant case, no such exception applies and the District Judge properly found that nothing aboard the Nedon contributed to the infestation. Upon analysis, therefore, fourth instruction is also not applicable in the instant case.
 
 
 226
 Consequently, only the third Lykes instruction remains and it clearly applies in the instant case. In Lykes, the shipper had not been immediately informed of the discovery of infestation. We implied that the carrier's failure to immediately inform the shipper might not have been prudent, depending upon the other options available to the shipper:
 
 
 227
 Without meaning to limit the District Court's third inquiry on remand, by way of illustration we point out three alternatives Shipper faced had it been immediately advised of the infestation. It could have (i) ignored the situation, hoping to salvage enough of the cargo to make that the most economical alternative, (ii) fumigated the cargo, or (iii) unloaded the cargo and attempted to sell it immediately.
 
 
 228
 511 F.2d at 225, 1975 A.M.C. at 2253 (footnotes omitted). Again, our case is distinguishable because both ADM and Bolivia were immediately informed of the infestation. Still, the above alternatives are useful in gauging Stevenson's conduct where the shipper and supplier refused to take any responsibility for the cargo, as here. See id. at 225 n.15, 1975 A.M.C. at 2253 n.15; Lekas & Drivas, Inc. v. Goulandris, 306 F.2d 426, 1962 A.M.C. 2366 (2d Cir. 1962).
 
 
 229
 The District Judge found that "Stevenson attempted to sell the cargo but was unsuccessful." 449 F.Supp. at 123. Stevenson was similarly unsuccessful in attempting to offload the cargo, in order to fumigate it ashore. The alternative of fumigation aboard ship was suggested by a surveyor but not followed by Stevenson. Instead, unable to obtain the cooperation of ADM or Bolivia, Stevenson filed this lawsuit approximately five weeks after loading and three weeks after Bolivia rejected the cargo.
 
 
 230
 Despite Stevenson's failure to fumigate the cargo aboard ship, we cannot fault the District Judge's conclusion that "Stevenson was not negligent in caring for the Nedon cargo." 449 F.Supp. at 123. The District Judge considered our Lykes standard and evaluated Stevenson's conduct in light of the circumstances as they appeared at the time. Stevenson's failure to fumigate aboard ship was only one of several possible courses of action. Because of its experience with the unsuccessful onboard fumigation of the Arizona and Southwall, it may well have been the reasonable course of action by Stevenson to avoid the cost of fumigating where that action appeared likely to be futile. The flour aboard the Nedon was tightly stowed, making effective fumigation very difficult. Since Stevenson made various other attempts to prevent further damage to the cargo, the District Judge was not erroneous in concluding that Stevenson discharged its duty to care for the Nedon flour.
 
 VII. Tag Ends
 A. An Evidentiary Ruling
 
 231
 ADM urges reversal because the District Judge excluded a portion of the testimony of Kenton Harris, its expert entomologist. Harris was excepted from the rule excluding witnesses from the courtroom, F.R.Evid. 615, and prior to his testimony heard substantial portions of the testimony presented by Stevenson and ADM. The overwhelming majority of Harris' admitted testimony concerned the source of the infestation. He testified as an expert that the flour mills used effective procedures and that the rail cars were properly prepared. He also described more as a factual witness than an expert what he had found in an earlier inspection of the State Docks warehouses. But when he attempted to testify to the condition of the Nedon and its cargo on his December 14, 1974, inspection, the District Judge ruled that the testimony would not be admitted. ADM did not offer the substance of Harris' testimony at that time, however. Only after trial, on motion for rehearing, did ADM offer the proof by means of affidavit.
 
 
 232
 The District Judge was probably required to permit Harris to be present during trial, since much of his testimony was expert opinion. F.R.Evid. 703; Morvant v. Construction Aggregates Corp., 570 F.2d 626 (6th Cir. 1978). But the fact that Harris also testified or attempted to testify as a factual, not merely expert, witness concerning his inspections does not automatically warrant exclusion of that factual testimony. ADM may have indicated at the beginning of trial that Harris would testify only as an expert, not a factual, witness. Even so, we do not normally permit exclusion of testimony simply because a witness violated the sequestration rule, or, in this case, an agreed exception to the rule. United States v. Suarez, 487 F.2d 236 (5th Cir. 1973), cert. denied, 415 U.S. 981, 94 S.Ct. 1572, 39 L.Ed.2d 878 (1974); United States v. Warren, 578 F.2d 1058, 1076 n.16 (5th Cir. 1978) (en banc). Notwithstanding the District Judge's broad discretion in evidentiary matters, it no doubt would have been error to exclude Harris' testimony concerning the Nedon if that ruling was based solely on Harris' presence during prior testimony. Harris' testimony, though concerned with the Nedon's condition fully two months after loading, had some relevance to the condition of the Nedon prior to loading and hence to establishing the source of the infestation and to Stevenson's care of the cargo. See F.R.Evid. 402.
 
 
 233
 We have no doubt, however, that the District Judge was within his discretion in excluding that marginally relevant testimony. First, prior to the testimony of Harris, ADM had presented its marine surveyor, who had inspected the Nedon at the earlier, more probative dates of December 2 and 3, 1974. That witness' testimony was substantially the same as Harris' testimony would have been (as set out in his post-trial affidavit). ADM also presented the testimony of two other witnesses who had inspected the Nedon. Because of the testimony of these witnesses, the District Judge was entitled to exclude Harris' testimony as cumulative. See Hamling v. United States, 418 U.S. 87, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974). For much the same reasons, and without deciding whether ADM's untimely offer of proof would alone have justified the District Judge's ruling, we are convinced that even if the evidence was erroneously excluded ADM's "substantial rights" were not affected. F.R.Evid. 103; Adamson v. Home Life Insurance Co., 508 F.2d 766 (5th Cir. 1975). ADM was not prejudiced by the ruling. The District Judge's evidentiary ruling therefore does not warrant reversal.
 
 B. Fumigation Of The Arizona And Southwall
 
 234
 The end to our labors today draws nigh, if not those of the District Judge. We believe that a remand is necessary to determine Stevenson's right to receive reimbursement from ADM for the cost of fumigating the Arizona and Southwall flour. The District Judge properly found that ADM had not entered into an enforceable agreement to pay for the fumigation. But even so, it is clear from our discussion of the Nedon claims that Stevenson had an obligation to care for the Arizona and Southwall flour. The record suggests that at the time of the fumigation, and without the benefit of the knowledge that the fumigation would turn out to be futile, Stevenson may well have been acting reasonably by deciding to fumigate. In that situation, unlike the decision in the Nedon, it may well have seemed prudent and not futile to fumigate onboard the ships. Thus, the fumigation may have been a required exercise by Stevenson of its duties under COGSA, as interpreted by Lykes, supra. The District Judge did not make that finding, however. He stopped with the finding that Stevenson had not obtained an enforceable agreement with ADM.
 
 
 235
 We remand in order for findings concerning whether the fumigation even though ultimately unsuccessful was a reasonable action required by COGSA. If so, Stevenson is entitled to reimbursement for the fumigation under admiralty principles,[106] and irrespective of any state law principles.[107] Although reimbursement is normally obtained in the first instance from the shipper, Bolivia, in this case Bolivia could then recover from ADM, which was responsible for the infestation. Since liability must eventually fall on ADM, the District Judge should simply hold ADM liable, if liability is appropriate at all.
 
 
 236
 To summarize briefly, we affirm the decision of the District Judge in all but one respect. The Judge should have considered other bases upon which Stevenson might recover the expense of fumigating the Arizona and Southwall flour. That matter should be resolved on remand, hopefully in an expedited proceeding. We see no need to augment this already extensive record on remand but the District Judge may in his discretion do so.
 
 
 237
 AFFIRMED IN PART, REVERSED IN PART and REMANDED.
 
 
 
 [1]
 Cf. Vaca v. Sipes, 386 U.S. 171, 210, 87 S.Ct. 903, 927, 17 L.Ed.2d 842, 869 (1967) (dissent) (amphibious Donneybrook)
 
 
 [2]
 One of the shiploads consisted of the res in this lawsuit, the 81,193 bags of flour
 
 
 [3]
 For the convenience of all, the following is a partial list of entities, organizations, and individuals referred to, as adapted from the District Court opinion:
 ADM: Miller and supplier of the
 flour in question
 Bolivia, Republic of: Purchaser of the flour in
 question
 Claure, Oscar: Bolivian Customs Agent in
 Arica
 Harris, Kenton L.: Entomologist, employee of O.
 D. Kurtz and Associates,
 hired by ADM
 Landivar, Heran: Sub-secretary, Bolivia
 Ministry of Industry: Commerce and Tourism,
 Republic of Bolivia
 Page & Jones, Inc.: Mobile steamship agent
 emloyed by Stevenson
 Saurez, Adriano: Bolivian representative in La
 Paz
 St. John International,
 Inc.: Steamship broker
 representing Bolivia
 Superintendence, Inc.: ADM's appointee to sample,
 test and weigh the flour at
 Mobile
 T. J. Stevenson &
 Company, Inc.,: Steamship agency employed
 by Bolivia to transport the
 flour from Mobile to Chile
 
 
 [4]
 The letter of credit was opened with First City National Bank of New York in ADM's favor for a total amount of $6,651,017.10, payable in specified installments. Payment under the letter of credit required presentation of commercial and consular invoices showing that the flour met certain chemical composition specifications and was "fit for human consumption."
 
 
 [5]
 TRADE CUSTOMS: A final, complete, and exclusive statement of the entire contract is contained herein, and no parol evidence, course of dealing or performance, or usage of the trade shall be relevant to supplement or explain it. There shall be no modification or alteration without written consent signed by both SELLER and BUYER
 
 
 [6]
 The booking note incorporated by reference Stevenson's usual bill of lading, which contained provisions largely identical, in relevant part, to those of the booking note
 
 
 [7]
 The letter of credit was opened with First National City Bank of New York in Stevenson's favor for a maximum amount of $1,923,120.00, payable in specified installments. In addition to the requirement that clean "on board" bills of lading be presented, certain commercial invoices were required
 
 
 [8]
 Reference to the flour involved in this case means the flour included in the last three shiploads taken aboard the Arizona, Southwall, and Nedon. The first five shiploads, constituting most of the 26,618 metric tons of flour bought by Bolivia involved no significant problems between the parties. See 449 F.Supp. at 88
 
 
 [9]
 The District Judge found, and the evidence supports, that ADM's subcontracting for the Bolivian flour was an accepted practice and did not breach the flour contracts. 449 F.Supp. at 90-91 n. 7. The parties do not contest this finding on appeal
 
 
 [10]
 Less than 1% of the contents of each hundred pound bag selected was sampled by the grain probe. Since 2% of all bags were probed, less than .02% (one part in every 5,000) of the entire amount of flour was in fact tested by Superintendence. See 449 F.Supp. at 94
 
 
 [11]
 ADM's letter of credit did not specify that clean bills of lading were required, but in actual practice these documents were required by ADM to obtain payment. Ultimately, of course, Stevenson could sue for its freight under the booking note's prepaid freight clause, while ADM had similar legal rights to the purchase price of the flour. Practically, however, issuance of other than claused bills of lading would have brought the entire transaction to a halt-as later events between the parties demonstrate
 
 
 [12]
 The decisions were made largely by Mr. Ivan Ellis, Stevenson's Vice President of Operations, since Mr. Thomas J. Stevenson, the President, was negotiating in South America during this period
 
 
 [13]
 The final report showed no indication of live infestation. One of the twelve samples contained two large, dead flour beetles; another sample contained beetle larvae; and four additional samples contained marginal indications of dead infestation. Apparently the information Stevenson received late in the evening of October 16 closely corresponded to that in the final report released on the following day
 
 
 [14]
 The underwriters eventually refused to pay claims by Stevenson connected with the Arizona and Southwall
 
 
 [15]
 By explicitly evaluating the milling operations of three out of four of the independent mills only, the District Judge implied that the ADM operated mills were not the source of infestation. On appeal, the parties concede that ADM operated mills were not the source of the infestation
 
 
 [16]
 Specifically, the District Judge made five findings:
 This fact, together with others, leads the Court to believe that the infestation was brought to the warehouses instead of originating in the warehouses. Accordingly, the Court is of the opinion that there is insufficient evidence to support the contention that live infestation existed in Warehouses 3 and 4 prior to the arrival of the ADM flour. On the contrary, the Court finds that the infestation of the flour in question did not come from the Alabama State Docks' Warehouses 3 and 4.
 
 
 [449]
 F.Supp. at 94 (footnote omitted)
 Having considered the evidence presented at trial, the Court finds that widespread infestation, involving some 40 to 50,000 bags was found by Superintendence on September 24, 1974, prior to the loading of the flour aboard the ARIZONA, SOUTHWALL and NEDON and therefore, the evidence clearly establishes that these vessels were not the source of the infestation found by Superintendence on September 24, 1974.
 Moreover, the evidence presented at trial supports a finding by the Court that there was no live infestation in State Docks Warehouses 3 and 4 prior to the arrival of the ADM flour.
 Id. at 118.
 The preponderance of the evidence supports the finding by the Court that the source of infestation first discovered by Superintendence in Mobile on September 24, 1974, was either the rail cars or one or more of the seven mills that shipped the Bolivian flour.
 Id. at 119.
 The Court is unable to agree with ADM's argument in that the preponderance of the evidence supports the finding that the flour in question did not arrive in Mobile in a clean and uninfested condition.
 Id. at 121.
 The Court finds that some of the flour loaded aboard the NEDON was infested when it arrived at the State Docks warehouses . . . .
 Id. at 126. Contrary to ADM's assertion, we do not find these fact findings the least bit inconsistent with one another.
 
 
 [17]
 Throughout the opinion, citations to the UCC should be taken to refer to the Illinois enactment of the Code. The cited section numbers are identical to those in Chapter 26 of the Illinois statutes
 
 
 [18]
 The issues relate to the interpretation of the flour contracts' warranty provision and F.A.S. delivery term
 
 
 [19]
 Part of the difficulty is that § 801(d) of the Federal Food, Drug and Cosmetic Act, 21 U.S.C.A. § 381(d), declares that:
 (d) A food, drug, device, or cosmetic intended for export shall not be deemed to be adulterated or misbranded under this chapter if it (1) accords to the specifications of the foreign purchaser, (2) is not in conflict with the laws of the country to which it is intended for export, and (3) is labeled on the outside of the shipping package to show that it is intended for export.
 Since the flour in this case was intended for export, arguably the above section of the Act applies. If so, the adulteration requirements of the Act, 21 U.S.C.A. § 342, may not be incorporated into the FDA warranty. Rather, the warranty may require mere compliance with "the specifications of the foreign purchaser." If so, the FDA warranty becomes essentially superfluous.
 Difficult questions arise even if 21 U.S.C.A. § 342's adulteration provisions are a part of the FDA warranty. In particular, our leading decision in United States v. 484 Bags, More or Less, 423 F.2d 839 (5th Cir. 1970), leaves open the possibility that the standard for adulteration established by a Court will be stricter than the norm accepted by the industry or even promulgated by the responsible administrative agency. Id. at 842. See 449 F.Supp. at 128 n.71 (elaborating on this point). We are therefore hesitant to enter such an uncharted and commercially significant area where it is not necessary to the resolution of the case.
 
 
 [20]
 Official Comment No. 7 to UCC § 2-314 states in this regard:
 Paragraphs (a) and (b) of subsection (2) are to be read together. Both refer, as indicated above, to the standards of that line of the trade which fits the transaction and the seller's business. "Fair average" is a term directly appropriate to agricultural bulk products and means goods centering around the middle belt of quality, not the least or the worst that can be understood in the particular trade by the designation, but such as can pass "without objection." Of course a fair percentage of the least is permissible but the goods are not "fair average" if they are all of the least or worst quality possible under the description.
 
 
 [21]
 In a curious attempt to bolster the District Judge's conclusion that the warranty of merchantability had been breached, Bolivia now argues that the Judge should not have considered one out of all of the many bits of extrinsic evidence that was considered. Bolivia asserts that the specifications of its letter of credit in favor of ADM cannot be considered because of the flour contracts' merger and parole evidence clause. That letter's quality requirement, besides grade specifications, was only that the flour be "fit for human consumption." The District Judge made no specific finding that the flour was unfit for human consumption. His discussion of United States v. Cassaro, Inc., 443 F.2d 153 (1st Cir. 1971) (infested flour "could be deemed adulterated even though it was fit for human consumption"), does however imply that he found adulteration, merchantability, and fitness for human consumption to be different and progressively less pure standards in the trade. See 449 F.Supp. at 127. But the District Judge considered the letter of credit's standard along with a great deal of other evidence. See 449 F.Supp. at 89 n.4. We believe that to the extent that the letter's standard favored ADM's position, the District Judge necessarily discounted the standard's importance relative to the other evidence in the course of determining the flour at all critical points unmerchantable. See id. at 126. Finding that we agree with the District Judge's ultimate conclusion, we need not consider Bolivia's parole evidence contention
 
 
 [22]
 Merchantability is a concept similar to strict tort liability; some of the same questions may be appropriate. For example, how difficult is it for manufacturers to produce flour at different levels of quality? Are small amounts of live or dead infestation more easily removed by sellers, by buyers, or is removal too difficult to be done at all? Should the costs of infestations occurring at random be spread among all buyers or be borne by the hapless few who take delivery of the flour? Cf. J. White & R. Summers, Handbook of the Law Under the Uniform Commercial Code § 9-6, at 286 (2d ed. 1972)
 
 
 [23]
 "A scientist with a microscope could find its filthy, putrid, and decomposed substances in almost any canned food we eat." United States v. 484 Bags, More or Less, supra, 423 F.2d at 841 (quoting United States v. 1,500 Cases, More or Less, 236 F.2d 208, 211 (7th Cir. 1956))
 
 
 [24]
 Such contamination has been informally permitted by the exercise of the FDA's broad discretion to prosecute violators of the Federal Food, Drug and Cosmetics Act pursuant to 21 U.S.C.A. § 336. See United States v. 449 Cases, 212 F.2d 567 (2d Cir. 1954); United States v. 484 Bags, More or Less, supra ; United States v. General Foods Corp., 446 F.Supp. 740 (N.D.N.Y.), aff'd, 591 F.2d 1332 (2d Cir. 1978)
 
 
 [25]
 Official Comment 8 to UCC § 2-314 (set out above)
 
 
 [26]
 In an early case under the Federal Food, Drug and Cosmetics Act, it was recognized that the visible presence of live worms in tomatoes would offend "the aesthetic tastes and sensibilities of the consuming public." United States v. 133 Cases of Tomato Paste, 22 F.Supp. 515, 516 (E.D. Pa. 1938)
 
 
 [27]
 The result of this case was subsequently altered by statute, Ill.Rev.Stat.Ann. Ch. 91, § 181 (Smith-Hurd). But its interpretation of Illinois warranty law is still valid. See also Stanton v. Shakofsky, 2 Ill.App.2d 527, 119 N.E.2d 812 (1954) (diseased hogs); Vlases v. Montgomery Ward & Co., Inc., 377 F.2d 846 (3d Cir. 1967) (Pa.) (diseased chickens)
 
 
 [28]
 The Code does not precisely define the concept of risk of loss. Even if the Code's risk of loss concept does not apply, we are confident that ADM would nonetheless be liable for deterioration of the flour because of the flour's defective condition as delivered to the carrier. See UCC § 1-103 (supplemental bodies of law-including those of estoppel, invalidating cause, and other equitable principles-continue to apply unless explicitly displaced by the UCC)
 
 
 [29]
 There was conflicting testimony as to the meaning of the term "free alongside" commonly referred to as F.A.S. in the Port of Mobile. ADM's position is that the State Docks tariff demonstrates that as between shipper and the State Docks, the delivery to the warehouse places the cargo at the risk of the vessel. On the contrary, Stevenson introduced the Rules and Regulations for the Port of Mobile (TJS Ex. 24) relying primarily on Rule # 8 which provided:
 "The phrases 'alongside' and 'within reach of ship's tackle' when applied to the receipt of and delivery of cargo, shall be construed literally, and the responsibility of the vessel shall commence and cease at the end of the tackle used by the ship."
 As will be noted below, the Court is of the opinion that the activities and circumstances surrounding these F.A.S. contracts along with the actions of ADM's appointee, Superintendence, considerably altered the meaning of this contractual provision.
 
 
 [449]
 F.Supp. at 121 n.60. Apparently, the District Judge inadvertently omitted the further discussion on this point to which he refers by the words "noted below."
 
 
 [30]
 However, we do decide a very closely-related delivery issue when assessing Stevenson's rights and duties as a carrier of the flour under its shipping contract with Bolivia
 
 
 [31]
 See generally Peters, Remedies for Breach of Contract Relating to the Sale of Goods Under the Uniform Commercial Code: A Roadmap for Article 2, 73 Yale L.J. 199, 246-47 (1963); J. White & R. Summers, supra, § 5-5, at 149-50; R. Nordstrom, supra, § 135
 Buyer's Rights on Improper Delivery
 Subject to the provisions of this article on breach in installment contracts (Section 2.612) and unless otherwise agreed under the sections on contractual limitations of remedy (Sections 2.718 and 2.719), if the goods or the tender of delivery fail in any respect to conform to the contract, the buyer may
 (1) reject the whole; or
 (2) accept the whole; or
 (3) accept any commercial unit or units and reject the rest.
 UCC § 2-601.
 
 
 [33]
 In practice the harsh edges of the perfect tender rule have been smoothed down in cases where the goods themselves are tendered: either a clause in the contract or trade custom or the past practice of the parties will be construed to permit minor discrepancies and an innocent delay of a day or two will not necessarily be fatal
 G. Gilmore & C. Black, The Law of Admiralty § 3-10, at 112-13 (2d ed. 1975). See also J. White & R. Summers, supra, § 8-2.
 "Installment Contract"; Breach
 (a) An "installment contract" is one which requires or authorizes the delivery of goods in separate lots to be separately accepted, even though the contract contains a clause "each delivery is a separate contract" or its equivalent.
 (b) The buyer may reject any installment which is non-conforming if the non-conformity substantially impairs the value of that installment and cannot be cured or if the non-conformity is a defect in the required documents; but if the non-conformity does not fall within Subsection (c) and the seller gives adequate assurance of its cure the buyer must accept that installment.
 (c) Whenever non-conformity or default with respect to one or more installments substantially impairs the value of the whole contract there is a breach of the whole. But the aggrieved party reinstates the contract if he accepts a non-conforming installment without seasonably notifying of cancellation or if he brings an action with respect only to past installments or demands performance as to future installments.
 UCC § 2-612.
 
 
 [35]
 At no point did ADM provide any assurances of cure of the flour's infestation. Thus for this reason alone § 2-612 may not be applicable, though we have not so decided. See G. Gilmore & C. Black, supra, § 3-10, at 112 & n.66
 
 
 [36]
 Finally, ADM argues that even if Bolivia was entitled to damages on the SOUTHWALL and ARIZONA cargoes there can be no recovery as there is complete lack of evidence as to the value of the goods in their actual condition in Mobile, Alabama, in that Bolivia's measure of damages for breach of warranty is the difference between the value of the flour at the time and place of acceptance (Mobile) and the value they would have had if they had been in the condition warranted in the contract. The statute governing this question is Section 2-714(2), which provides in part as follows:
 (2) The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount.
 Bolivia's theory of damages (Bol. Ex. 47) is based on the premise that Bolivia had no reasonable opportunity to inspect the cargo in Mobile and therefore the damages should be based on the official wholesale price of such flour established by the Republic of Bolivia.
 Having considered the matter, the Court finds that the Ministry having accepted the non-conforming flour aboard the ARIZONA and SOUTHWALL is entitled to damages against ADM in the amount of $325,960.51, together with interest at the legal rate of six percent (6%) per annum from the date of this judgment until paid.
 Footnote 77 sets out the basis for the Judge's calculation of damages.
 The Ministry claims that although the total cost per 100-pound bag of flour at the time such flour arrived in Bolivia was approximately $17.00, the official wholesale price of such flour fixed by the Republic of Bolivia was only $14.7059 per bag in La Paz and Oruro, and $14.9388 per bag in Cochabamba, Bolivia.
 The best wholesale price obtainable by the Ministry for the infested flour in Bolivia was $12.7206 in La Paz and Oruro and $12.9221 in Cochabamba. Therefore, the Ministry contends that it is entitled to recover the difference between the price for good flour and the price for infested flour. Since the Ministry's national plan of supply had allocated 64,872 bags to La Paz, 54,990 bags to Cochabamba and 5,330 bags to Oruro, the Ministry could have obtained $1,603,597.84. Accordingly, the Ministry's damages are $250,270.36 (Bol. Exs. 46, 47).
 In addition to said sum of $250,270.36, the Ministry is entitled to recover $75,690.15 for the additional expenses incurred due to the infestation of the flour. (Bol. Exs. 48, 49, 51).
 
 
 [449]
 F.Supp. at 129-30 (emphasis supplied)
 
 
 [37]
 Neither Bolivia nor anyone else argued to the District Judge that UCC § 2-714(1)'s "special circumstances" exception justified use of Bolivian damages even if acceptance occurred in Mobile. For the first time, Bolivia now argues that the District Judge awarded Bolivian damages because of special circumstances. In contradistinction, ADM's brief fully recognizes that the District Judge adopted Bolivia's original argument that acceptance occurred in South America rather than in Mobile. ADM's brief in fact specifically attacks the implied finding of acceptance in South America. Consequently, we are not misled by Bolivia's change of position on appeal
 
 
 [38]
 Official Comment 2 to UCC § 2-606 (defining acceptance) states that "acceptance of title is not material under this Article to the detailed rights and duties of the parties." Section 2-401 reinforces this concept:
 Each provision of this Article with regard to the rights, obligations and remedies of the seller, the buyer, purchasers or other third parties applies irrespective of title to the goods except where the provision refers to such title.
 See also UCC §§ 2-513(3)(b) & 2-310(c); Official Comments 5 & 7 to § 2-513. Cf. 2-512(1)(a) exception not applicable because no one had any awareness of live infestation as of time that the ships departed for South America, since the flour had been recently and apparently effectively fumigated.
 
 
 [39]
 Official Comment 3 to UCC § 2-513 states in part:
 Any reasonable time, place or manner is available to him and the reasonableness will determined by trade usages, past practices between the parties and the other circumstances of the case.
 The last sentence of subsection (1) makes it clear that the place of arrival of shipped goods is a reasonable place for their inspection.
 
 
 [40]
 We do not decide whether Bolivia's conduct also amounted to acts "inconsistent with the seller's ownership," which under UCC § 2-606(1)(c) is another way that Bolivia might be deemed to have accepted the flour
 
 
 [41]
 There is widespread agreement as to this aspect of the notice requirements. Reviewing precedent from various jurisdictions, we stated in Eastern Air Lines, Inc. v. McDonnell Douglas Corp., 532 F.2d 957, 973 (5th Cir. 1976):
 As will be demonstrated below, the adequacy and timeliness of notice under section 2-607 typically depend upon the reasonableness of the buyer's efforts to communicate his dissatisfaction. See United States v. Crawford, 5 Cir., 1971, 443 F.2d 611, 614. Therefore, whether the notice requirement has been complied with is a question which is particularly within the province of the jury. See Pritchard v. Liggett & Myers Tobacco Company, 3 Cir., 1961, 295 F.2d 292, 298; L. A. Green Seed Company of Arkansas v. Williams, Ark., 1969, 438 S.W.2d 717; 2 R. Anderson, Uniform Commercial Code § 2-607:24 (1971). As was noted by the Third Circuit:
 Where more than one inference may be drawn from undisputed facts, or the facts are disputed, the timeliness and sufficiency of a notice of breach . . . are questions for the jury to resolve. The question of reasonableness must be determined from the circumstances in the individual case.
 Pritchard v. Liggett & Myers Tobacco Company, supra (applying Uniform Sales Act); see Columbia Axle Co. v. American Automobile Ins. Co., 6 Cir., 1933, 63 F.2d 206, 208.
 See also E. C. Ernst v. General Motors Corp., 537 F.2d 105, 108 (5th Cir. 1976) (Ga.).
 
 
 [42]
 See Smith v. Butler, 19 Md.App. 467, 311 A.2d 813 (1973); International Paper Co. v. Margrove, Inc., 75 Misc.2d 763, 348 N.Y.S.2d 916 (Sup.Ct., Monroe Cty. 1973); R. I. Lampus Co. v. Neville Cement Products Corp., 232 Pa.Super. 242, 336 A.2d 397 (1975)
 
 
 [43]
 See Overland Bond & Investment Corp. v. Howard, 9 Ill.App.3d 348, 292 N.E.2d 168 (1972); Murray v. Kleen Leen, Inc., 41 Ill.App.3d 436, 354 N.E.2d 415 (1976); Lynx Inc. v. Ordnance Products, Inc., 273 Md. 1, 327 A.2d 592 (1974)
 
 
 [44]
 This quotation is from a portion of Official Comment 4 to § 2-607. The Comment in its entirety states:
 
 
 [4]
 The time of notification is to be determined by applying commercial standards to a merchant buyer. "A reasonable time" for notification from a retail consumer is to be judged by different standards so that in his case it will be extended, for the rule of requiring notification is designed to defeat commercial bad faith, not to deprive a good faith consumer of his remedy
 The content of the notification need merely be sufficient to let the seller know that the transaction is still troublesome and must be watched. There is no reason to require that the notification which saves the buyer's rights under this section must include a clear statement of all the objections that will be relied on by the buyer, as under the section covering statements of defects upon rejection (Section 2-605). Nor is there reason for requiring the notification to be a claim for damages or of any threatened litigation or other resort to a remedy. The notification which saves the buyer's rights under this Article need only be such as informs the seller that the transaction is claimed to involve a breach, and thus opens the way for normal settlement through negotiation.
 In Eastern Air Lines, Inc. v. McDonnell Douglas Corp., supra, 532 F.2d at 975-76, we observed that the last sentence of this comment was the principal basis for the Eighth Circuit's decisions, of which we disapproved.
 
 
 [45]
 Bonebrake v. Cox, 499 F.2d 951, 956-57 (8th Cir. 1974) (Iowa); Lewis v. Mobil Oil Corp., 438 F.2d 500, 509 (8th Cir. 1971) (Ark.); Boeing Airplane Co. v. O'Malley, 329 F.2d 585, 593-96 (8th Cir. 1964) (Pa.); Jay V. Zimmerman Co. v. General Mills, Inc., 327 F.Supp. 1198, 1204 (E.D.Mo.1971) (Mo.); Oregon Lumber Co. v. Dwyer Overseas Timber Products Co., 280 Or. 437, 440, 571 P.2d 884, 886 (1977); Metro Investment Corp. v. Portland Road Lumber Yard, Inc., 263 Or. 76, 80, 501 P.2d 312, 315 (1972)
 
 
 [46]
 E. g., Standard Alliance Industries, Inc. v. Black Clawson Co., 587 F.2d 813, 824 (6th Cir. 1978) (Ohio); Clow Corp. v. Metro Pipeline Co., 442 F.Supp. 583, 588-89 (N.D.Ga.1977) (Ga.); Kopper Glo Fuel, Inc. v. Island Lake Coal Co., 436 F.Supp. 91, 95-97 (E.D.Tenn.1977) (Tenn.); Cotner v. International Harvester Co., 260 Ark. 885, 545 S.W.2d 627 (1977); Fischer v. Mead Johnson Laboratories, 41 App.Div.2d 737, 341 N.Y.S.2d 257 (2d Dept. 1973)
 
 
 [47]
 There are no decisions by Illinois Courts that are on point, In Overland Bond & Investment Corp. v. Howard, supra, a case involving a consumer's defective automobile, the Illinois Court did, however, state the notice requirement in terms similar to that of Eastern Air Lines :
 There are no particular words which must be used to constitute an adequate form of notice. See Wainwright v. Elgin Windmill Co., 9 Ill.App.2d 574, 134 N.E.2d 44, and Uniform Commercial Code Comment SHA, ch. 26, par. 2-607, p. 454 (1963). Certainly by having the car towed to the dealer's place of business, by informing its employees that the car was again in need of major repair, thus clearing implying that it could not be operated in a safe manner until such repairs were completed, was sufficient notice to the dealer that its implied warranties had been breached.
 
 
 [9]
 Ill.App.3d at 357-58, 292 N.E.2d at 176 (emphasis supplied). Also supporting the Eastern Air Lines approach is a pre-Code case interpreting Illinois law. In Charles v. Judge & Dolph, Ltd., 263 F.2d 864, 868 (7th Cir. 1959), the Court interpreted § 49 of the Uniform Sales Act, Ill.Rev.Stat. Ch. 1211/2, § 49:
 It is well established that notice of defects is not a notice of breach of warranty. In an opinion by Judge Hand in American Mfg. Co. v. United States Shipping Board Emergency Fleet Corp., 2 Cir., 7 F.2d 565, 566, the court said: "The notice 'of the breach' required is not of the facts, which the seller presumably knows quite as well as, if not better than, the buyer, but of the buyer's claim that they constitute a breach. The purpose of the notice is to advise the seller that he must meet a claim for damages, as to which, rightly or wrongly, the law requires that he shall have early warning."
 Remarkably, in Eastern Air Lines, we found that § 2-607(3)(a) continued many of the policies of § 49 of the Uniform Sales Act; and in so doing we quoted the same portion of Judge Learned Hand's opinion. See 532 F.2d at 971-72.
 
 
 [48]
 E. g., E. C. Ernst, Inc. v. General Motors Corp., supra, 537 F.2d at 110-11 (upholding jury finding)
 
 
 [49]
 E. g., Southern Illinois Stone Co. v. Universal Engineering, supra, 592 F.2d at 452 (encouraging compromise); Clow Corp. v. Metro Pipeline Co., supra, 442 F.Supp. at 589 (encouraging good faith); Kopper Glo Fuel, Inc. v. Island Lake Coal Co., supra, 436 F.Supp. at 96 (encouraging good faith conduct). While endorsing the Eastern Air Lines approach, Standard Alliance Indust., Inc. v. Black Clawson Co., supra, seemingly reinterprets the second of § 2-607(3) (a)'s underlying policies:
 Notice of breach serves two distinct purposes. First, express notice opens the way for settlement through negotiation between the parties. Comment four, supra ; Eckstein v. Cummins, 41 Ohio App.2d 1, 321 N.E.2d 897, 901 (1974). Second, proper notice minimizes the possibility of prejudice to the seller by giving him "ample opportunity to cure the defect, inspect the goods, investigate the claim or do whatever may be necessary to properly defend himself or minimize his damages while the facts are fresh in the minds of the parties."
 587 F.2d at 826 (quoting Note, Notice of Breach and the Uniform Commercial Code, 25 U.Fla.L.Rev. 520, 522 (1973)). But, as J. White & R. Summers, supra, § 11-9, at 344, point out, this articulation of the second policy is just the equivalent of the commercial good faith policy, in that "if the court senses that a merchant buyer is lying in the Johnson grass with the thought of increasing his damages, it will not hesitate a moment to cut him off."
 
 
 [50]
 This quote is from a telex sent from ADM to Stevenson on September 30, 1974, reproduced at 449 F.Supp. at 101 n.22
 
 
 [51]
 The continuous communications between the parties in this case are different from those in Eastern Air Lines, supra, in several respects. Most importantly, in this case the communications arose only after problems with the goods began and were exclusively focused on those problems
 
 
 [52]
 SHIPMENTS MADE UNDER LETTERS OF CREDIT 9090-9115 YOUR CCF 047628 AND CCF 48548 MERCHANDISE FOUND CONTAMINATED FROM ORIGIN IN ACCORDANCE CERTIFICATE FROM SUPERINTENDENCE COMPANY INC. NO. 18625 IN VIEW OF THIS DEFECT AND DESPITE THE IRREVOCABILITY OF LETTER OF CREDIT BUYERS REQUEST THAT NO PAYMENT BE MADE WITHOUT PRIOR APPROVAL ADVISE BENEFICIARIES AND CABLE US UNQUOTE WIRE US YOUR AGREEMENT TO ABOVE PROCEDURE ON FUTURE SHIPMENTS STOP CREDIT 48548 REFERS TO STEVENSON LINE OCEAN FREIGHT CREDIT
 
 
 [53]
 Cf. Standard Alliance Industries, Inc. v. Black Clawson Co., supra (notice of one breach insufficient as notice of a subsequent breach); Davis v. Vintage Enterprises, Inc., 23 N.C.App. 581, 209 S.E.2d 824 (1974)
 
 
 [54]
 See also UCC § 1-204(1) (specifically providing that a reasonable time may be fixed by agreement; the time provision of the instant contract is not specifically at issue here, however)
 
 
 [55]
 It was not argued below that the registered mail and sample requirements were manifestly unreasonable when judged from the time of the contracts' formation. Nor, judged from the time of contracting, do we perceive those requirements to be manifestly unreasonable. But neither do we believe that the District Judge's holding was based upon § 1-102(3)'s manifestly unreasonable test
 
 
 [56]
 UCC § 1-103; Summers, General Equitable Principles Under Section 1-103 of the Uniform Commercial Code, 72 Nw.U.L.Rev. 906 (1978)
 
 
 [57]
 Subject to the provisions of the next section on modification and waiver, such course of performance shall be relevant to show a waiver or modification of any term inconsistent with such course of performance
 
 
 [58]
 Although an attempt at modification or rescission does not satisfy the requirements of Subsection (b) or (c) it can operate as a waiver
 
 
 [59]
 E.g., Polycon Indus., Inc. v. Hercules Inc., 471 F.Supp. 1316, 1324 (E.D.Wis.1979); Nederlandse Draadindustrie NDI B. V. v. Grand Pre-Stressed Corp., 466 F.Supp. 846, 851 (E.D.N.Y.), aff'd without opinion, 614 F.2d 1289 (2d Cir. 1979); Oskey Gasoline & Oil Co. v. OKC Refining Inc., 364 F.Supp. 1137, 1142-43 (D.Minn.1973); Resource Engineering, Inc. v. Siler, 94 Idaho 935, 500 P.2d 836 (1972); Blue Rock Indus. v. Raymond International, Inc., 325 A.2d 66 (Me.1974); Gulf Chemical & Metallurgical Corp. v. Sylvan Chemical Corp., 122 N.J.Super. 499, 300 A.2d 878 (Law.Div.), aff'd, 126 N.J.Super. 261, 314 A.2d 73 (App.Div.1973); All-Year Golf, Inc. v. Products Investors Corp., 34 App.Div.2d 246, 310 N.Y.S.2d 881 (4th Dept.1970)
 
 
 [60]
 The situation is closely analogous to that in Chemetron Corp. v. McLouth Steel Corp., 381 F.Supp. 245 (N.D.Ill.1974), and United States Hoffman Machinery Corp. v. Carlson, 253 Iowa 304, 111 N.W.2d 271 (1961). In Chemetron the Court held that the seller's affirmative replies to the buyer's objections "and the failure ever to mention" the contract's ("paragraph XIII") notice requirement
 show either that McLouth never considered paragraph XIII to apply to the situation at hand, or, if McLouth did consider it applicable, its conduct conveyed its lack of concern about notice according to the terms of that paragraph. The first possibility supports the conclusion that paragraph XIII should not be construed as being applicable to claims for nondeliveries; the alternate possibility presents a classic situation in which McLouth should be estopped from raising such a defense.
 
 
 [381]
 F.Supp. at 255 (emphasis supplied). In Carlson, the court similarly stated:
 (The buyer) did not give notice of defects by registered mail within ninety days after delivery as required by the contract, but this failure is unimportant. (The seller) knew of the complaints, promised help and attempted repairs up to June 1955. (The seller's) actions waived the formality of notice required by the contract.
 
 
 [253]
 Iowa at 306, 111 N.W.2d at 272
 
 
 [61]
 A party who has made a waiver affecting an executory portion of the contract may retract the waiver by reasonable notification received by the other party that strict performance will be required of any term waived, unless the retraction would be unjust in view of a material change of position in reliance on the waiver
 
 
 [62]
 Bolivia also moved for a protective order on the same grounds with respect to Landivar's superior, Secretary Miguel Ayoroa of the Bolivian Ministry of Industry, Commerce and Tourism. It appears that this motion was also not acted upon by the Court
 
 
 [63]
 Besides Landivar, these included Oscar Claude, Bolivian Customs Agents in Arica, and Adriano Suarez, Bolivian Representative in La Paz, Bolivia
 
 
 [64]
 Kingsley v. Baker/Beach-Nut Corp., 546 F.2d 1136 (5th Cir. 1977); Bettes v. Stonewall Ins. Co., 480 F.2d 92 (5th Cir. 1973); United States v. City of Brookhaven, 134 F.2d 442 (5th Cir. 1943); MBI Motor Co. v. Lotus/East Inc., 506 F.2d 709 (6th Cir. 1974); Simms v. Andrews, 118 F.2d 803 (10th Cir. 1941)
 
 
 [65]
 ADM's argument is that Rule 15(b) applies ignores the fact that Stevenson applied for and received, albeit after the close of evidence, formal leave of Court to file its counterclaim which had been physically filed on April 2. Under this circumstance and because a counterclaim is involved, the provisions of two other Rules seem as applicable as those of Rule 15(b). The first is F.R.Civ.P. 15(a) (emphasis supplied):
 Amendments. A party may amend his pleading once as a matter of course at any time before a responsive pleading is served or, if the pleading is one to which no responsive pleading is permitted and the action has not been placed upon the trial calendar, he may so amend it at any time within 20 days after it is served. Otherwise a party may amend his pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires.
 So too F.R.Civ.P. 13(f) seems directly applicable:
 Omitted Counterclaim. When a pleader fails to set up a counterclaim through oversight, inadvertence or excusable neglect, or when justice requires, he may by leave of court set up the counterclaim by amendment.
 
 
 [66]
 E. g., Scully Signal Co. v. Electronics Corp. of America, 570 F.2d 355, 362-63 (1st Cir. 1977); International Harvester Credit Corp. v. East Coast Truck & R. V. Sales, Inc., 547 F.2d 888, 890 (5th Cir. 1977); DeHaas v. Empire Petroleum Co., 435 F.2d 1223, 1229 (10th Cir. 1970)
 
 
 [67]
 Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971); Harkless v. Sweeny Independent School District, 554 F.2d 1353 (5th Cir. 1977), cert. denied, 434 U.S. 966, 98 S.Ct. 507, 54 L.Ed.2d 452 (1978)
 
 
 [68]
 Comparing Rules 13(f) and 15(a), we find that those standards coalesce under the circumstances of this case, just as we treated these rules equally in Spartan Grain & Mill Co. v. Ayers, 517 F.2d 214, 220 (5th Cir. 1975). See also Merchantile Trust Co. National Assoc. v. Inland Marine Products Corp., 542 F.2d 1010, 1012 n.5 (8th Cir. 1976); Smith Contracting Corp. v. Trojan Construction Co., 192 F.2d 234 (10th Cir. 1951); 6 C. Wright & A. Miller, supra, § 1479, at 403 (1971) ("thus little seems to turn on whether the amendment is made under Rule 13(f) or Rule 15(a) . . ."); 3 Moore's Federal Practice, supra P 15.07(3)
 
 
 [69]
 To disallow a compulsory counterclaim would enable the opposing party to bar recovery in a later suit by interposing a plea of res judicata. In the instant case, Stevenson's counterclaim is clearly compulsory. F.R.Civ.P. 13(a); Plant v. Blazer Financial Services, Inc., 598 F.2d 1357, 1360 (5th Cir. 1979)
 
 
 [70]
 See generally International Harvester Credit Corp. v. East Coast Truck & R. V. Sales, Inc., supra (Rule 15(b) amendment on District Court's initiative); American Hot Rod Assoc., Inc. v. Carrier, 500 F.2d 1269, 1275-76 (4th Cir. 1974) (Rule 15(b) amendment sought three days after trial refused); United States v. Hardy, 368 F.2d 191 (10th Cir. 1966) (counterclaims)
 
 
 [71]
 Landivar was working for the Bolivian Government at the time the telex was sent. The fact that Landivar apparently left his employment before the case was tried does not affect our reasoning concerning the pretrial production of the telex
 
 
 [72]
 Foreign countries litigating in our Courts are expected to be as familiar with the Court's rules of discovery as are other litigants. As mentioned above, Bolivia's trial counsel was as surprised as the other parties when Landivar produced the telex from his coat pocket
 
 
 [73]
 United States v. Reliable Transfer Co., 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975)
 
 
 [74]
 In making this argument, Bolivia essentially accepts the District Judge's findings that the actions of Bolivian officials were a proximate cause of the detention in Arica. In any event, we accept as not clearly erroneous the District Judge's findings of fact and agree with his conclusion that Bolivia, as consignee, was obligated to take the defective cargo in Arica or else become liable for detention. See 449 F.Supp. at 124-25; W. Tetley, Marine Cargo Claims, 137 (2d ed. 1978) ("The consignee, who is owner of the goods, cannot refuse delivery of damaged goods. . . ."). We also accept that portion of the District Judge's opinion that holds, in the alternative, that even if ADM misrepresented the flour contracts specifications to Stevenson prior to the departure of the Arizona and Southwall from Mobile, the detention was nevertheless not proximately caused by those misrepresentations. 449 F.Supp. at 124
 
 
 [75]
 Stevenson argues that Bolivia cannot raise this issue on appeal because it was not raised below. Although the issue is not directly discussed in the District Judge's thorough opinion, we believe the pleadings, evidence at trial, and closing arguments fairly raised the issue below
 
 
 [76]
 See 2A R. Benedict, Admiralty §§ 21 & 22 (6th ed. 1977)
 
 
 [77]
 Nor is ADM asserting such a theory. In view of our discussion, below, the theory is any event meritless
 
 
 [78]
 The Carso, 43 F.2d 736, 744, 1930 A.M.C. 1743, 1758 (S.D.N.Y.1930), aff'd in part and rev'd in part on other grounds, 53 F.2d 374, 1931 A.M.C. 1497 (2d Cir.), cert. denied sub nom. Navigazione Libera Triestina v. Mohnelli Giannusa & Rao, Inc., 284 U.S. 679, 57 S.Ct. 140, 76 L.Ed. 574 (1931)
 
 
 [79]
 E. g., Austin Nichols & Co. v. S. S. Isla De Panay, 267 U.S. 260, 45 S.Ct. 269, 669 L.Ed. 603, 1925 A.M.C. 447 (1925); Portland Fish Co. v. States S. S. Co., 510 F.2d 628, 1975 A.M.C. 2373 (9th Cir. 1974); Cummins Sales & Service, Inc. v. London & Overseas Ins. Co., 476 F.2d 498, 1973 A.M.C. 2047 (5th Cir.), cert. denied 414 U.S. 1003, 94 S.Ct. 359, 38 L.Ed.2d 239 (1973); Demsey & Associates, Inc. v. S. S. Sea Star, 461 F.2d 1009, 1972 A.M.C. 1440 (2d Cir. 1972); Yaramex International v. S. S. Tendo, 1977 A.M.C. 1807 (U.S.E.D.Va.1977)
 
 
 [80]
 In this case, Stevenson was pressured by ADM to issue a clean bill of lading. Although ADM was technically not the shipper of the flour and did not absolutely need clean bills of lading in order to collect under its letter of credit, it is apparent that the transaction would have been disrupted by the issuance of claused bills of lading. In part, this is because Stevenson could not immediately collect freight under its letter of credit without clean bills of lading
 
 
 [81]
 E. g., Demsey & Associates, Inc. v. S. S. Sea Star, supra; Continex, Inc. v. S. S. Flying and Independent & Isbrandtsen Co., 106 F.Supp. 319, 1952 A.M.C. 1499 (S.D.N.Y.1952). "The letter of indemnity is the central document to a fraud, and has been treated as such by most courts." W. Tetley, supra, at 401 (footnote omitted). See also A. Knauth, The American Law of Ocean Bills of Lading 183-84 & 411-12 (4th ed. 1953); G. Gilmore & C. Black, supra, at 122-23 n. 80 ("curious and doubtful practice"). In this case, Stevenson requested but did not obtain a letter of indemnity from ADM. As stated above, Stevenson nonetheless decided to issue clean bills of lading because of its belief that the fumigation had killed all of the flour beetles
 
 
 [82]
 The apparent order and condition indicated on a bill of lading normally refers only to the external appearance of the cargo. United States v. Lykes Bros. S.S. Co., 511 F.2d 218, 223, 1975 A.M.C. 2244, 2250 (5th Cir. 1975). But it has been repeatedly held that the bill of lading must state the condition of the goods themselves, even if they are not externally observable, where the carrier nonetheless knows or should have known that the goods are damaged. E.g., Yeramex International v. SS Tendo, supra, 1977 A.M.C. at 1824; The Radja, 1953 A.M.C. 1888 (U.S. N.D. Calif. 1953); M. Paquet & Co. v. Dart Container Line Co., 74 Misc.2d 352, 343 N.Y.S.2d 446, 1973 A.M.C. 926 (1973). The wording of COGSA's provision, 49 U.S.C.A. § 1303(3)(c) ("reasonable ground for suspecting") reinforces those decisions. Moreover, although the precise issue has not been widely addressed, we believe from the statutory wording it is obvious that the bill of lading must reflect the carrier's state of knowledge as of the time that the bill of lading is issued, even though the carrier learned of pre-shipment damage subsequent to the actual loading. See id. ("After receiving the goods . . . the carrier . . . shall . . . issue . . . a bill of lading . . . .")
 In this case, Stevenson learned of live infestation during loading. The ships were fumigated, then bills of lading were issued. In the usual situation where the consignee knows nothing of the circumstances surrounding receipt of the goods by the carrier, we do not doubt that the consignee would have been very interested in the fact that the cargo was infested with live insects prior to loading, even though all insects had apparently been killed by means of subsequent onboard fumigation. But cf. Tokio Marine & Fire Ins. Co. v. Relta SS. Co., 426 F.2d 1372, 1970 A.M.C. 1611 (9th Cir. 1970) (a widely criticized decision in which it was held that rust on metal products need not be indicated).
 
 
 [83]
 St. John represented Bolivia as its steamship broker. This agency relationship is sufficient to impute St. John's knowledge to Bolivia where shipping matters are concerned. Rest 2d, Agency § 268. There is apparently a substantial question whether St. John in fact kept Bolivian officials fully informed
 
 
 [84]
 This fact is also inherent in the District Judge's alternative holding that ADM's misrepresentations (made before the Arizona and Southwall sailed from Mobile) were not a proximate cause of the detention. See note 74 supra
 
 
 [85]
 E.g., Cummins Sales & Service, Inc. v. London & Overseas Ins., Co., supra, 476 F.2d at 500, 1973 A.M.C. at 2051-52; Pacific Micronesian Lines, Inc. v. New Zealand Ins. Co., 366 F.2d 333, 336, 1966 A.M.C. 2376, 2379 (9th Cir. 1966) ("limited to . . . where . . . the holder . . . has . . . relied"); Baltic Cotton Co. v. United States, 55 F.2d 568, 569, 1932 A.M.C. 272, 273-274 (5th Cir. 1932); Holden v. S.S. Kendall Fish, 212 F.Supp. 106, 110, 1964 A.M.C. 1791, 1796 (E.D. La. 1962). See Pomerene Act § 6, 49 U.S.C.A. § 102(b) (stating that the holder must have been "relying upon the description therein . . .")
 
 
 [86]
 This is the amount stated in the amended final judgment of December 30, 1976. When the judgment was amended, footnote 55 of the District Judge's opinion was also changed to reflect an additional two days for unloading in Arica, thus reducing Stevenson's award by $7,700. See 449 F.Supp. at 119. However, the District Judge overlooked changing the conclusory paragraph at 449 F.Supp. at 122, which shows an award of $317,767.25. Of course, the lower amount stated in the amended final judgment is the amount which the District Judge intended to award. See F.R.Civ.P. 60(a)
 
 
 [87]
 We discuss three of ADM's points of error at this time; the fourth is answered by our discussion in the next section VI
 
 
 [88]
 As previously discussed, the Code's framework "with regard to the rights, obligations and remedies of the seller, the buyer, purchasers or other third parties applies irrespective of title to the goods. . . ." UCC § 2-401 (emphasis supplied). See note 38 supra
 
 
 [89]
 As mentioned above and discussed in the following section VI, ADM claims that Stevenson took delivery of the flour as early as the flour's arrival at the State Docks warehouses. In contrast, Stevenson contends that delivery occurred only when the flour came "within reach of ship's tackle" just prior to the loading of the ship
 
 
 [90]
 The next blossoming of the reasoned judgment case law was caused by a different war. Two decisions of the Ninth Circuit stemmed from World War II: The Wildwood, 133 F.2d 765, 1943 A.M.C. 320 (9th Cir.), cert. denied sub nom. Amtorg Trading Corp. v. American Foreign S.S. Corp., 319 U.S. 771, 63 S.Ct. 1436, 87 L.Ed. 1719 (1943) (mid-Pacific abandonment of voyage to Russia in early 1940 not unreasonable); and De La Rama S.S. Co. v. Ellis, 149 F.2d 61, 1945 A.M.C. 389 (9th Cir.), cert. denied, 326 U.S. 718, 66 S.Ct. 23, 90 L.Ed. 425 (1945). De La Rama is remarkable for its similarity to the instant case. The carrier in that case contracted to deliver glassware from New York to the Philippines. Loading began during the afternoon of Sunday, December 7, 1941, and continued through the next day. Within hours after loading was begun, the news of Japan's infamous attack on Pearl Harbor reached the carrier. Customs authorities refused to allow the vessel to sail, the cargo was unloaded, and the voyage subsequently abandoned. As in our case, the carrier placed a lien on the cargo and sued for prepaid freight. The District Court held that the carrier's loading of the vessel constituted an unreasonable judgment because it occurred after the carrier had heard the initial reports of the Pearl Harbor attack. The Ninth Circuit accepted the reasoned judgment rule but reversed because it disagreed with the District Court's factual findings. The Appeals Court held that the carrier had exercised reasoned judgment because, at the time of loading, the news reports and other circumstances were not yet so pessimistic as to give a reasonable carrier notice that the vessel would not be able to complete the voyage
 To round out relevant precedents, the last is perhaps the most intriguing. It, too, is a result of war: this time, the capture of Saigon by hostile forces, marking the closing of American involvement in Vietnam. In United States v. Waterman S.S. Corp., 471 F.Supp. 87 (D.D.C.1979), appeal dismissed by stipulation, Nos. 79-1865 & 79-1866 (D.C. Cir., Nov. 12, 1979), District Judge Gesell engrafted a slight exception on the reasoned judgment rule. There, a shipper, the Department of State's Agency for International Development ("AID"), contracted with Waterman for the ocean carriage of various goods to Saigon. Similarly to De La Rama, there were indications that Saigon was about to fall during the time of loading. Subsequently, Saigon did fall and the voyage was abandoned.
 Judge Gesell alternatively held that an exception to the reasoned judgment rule applied. He stated that the rule has the effect of imputing "into the written documents a contractual term that the parties did not themselves place there." Id. at 92. Courts should only impute such contractual terms when a contract of adhesion is involved. The reason that the contract of carriage is normally an adhesion contract is that the law presumes that the carrier's bargaining power is disproportionately greater than that of the usual private shipper. Id. at 90. Thus, Judge Gesell concluded that the reasoned judgment rule would apply without exception in the usual case in which the shipper's bargaining power and personal knowledge was inferior to that of the carrier's. But there, AID's powers as a shipper were greater than those of the usual private shipper. Under administrative regulations, AID had the power to order the carrier to do various tasks ("pre-screening, vesting, and diversionary powers"), so that AID had a great deal more bargaining power than the usual private shipper. Since the usual disproportionate inequality in bargaining power was not present, Judge Gesell held that the reasoned judgment rule did not apply. Rather, Waterman was entitled to its prepaid freight subject only to the easily satisfied condition that at the time it executed its bills of lading for the loaded cargo it did not have actual or constructive knowledge that Saigon's fall was inevitable and imminent.
 
 
 [91]
 We agree that the reasoned judgment cases have not involved problems stemming from the condition of the cargo. But not all of the cases have involved matters such as navigation and scheduling, which are peculiarly within the carrier's knowledge. Orient and arguably The Styria involved those matters and support Stevenson's argument. But The Wildwood, De La Rama, and Waterman involved events of politics and war. While those matters may be within the special knowledge of heads of state and diplomats, they are not peculiarly within the carrier's traditional knowledge
 
 
 [92]
 Cf. De La Rama, supra, 149 F.2d at 64, 1945 A.M.C. at 393 ("On the other side, the record is persuasive of appellant's intent to sail the vessel immediately upon completion of the New York loading unless instructions to the contrary were received either from American authorities or from Manila.")
 
 
 [93]
 Stevenson appears to make the further argument that the District Judge's position, if affirmed, would leave a carrier whose cargo was partially loaded in a position of considerable risk, since by the time a ship is partially loaded it is irretrievably committed to the voyage. But this argument is not persuasive. The prepaid freight clause in fact works a great improvement in the carrier's exposure to risk under the general maritime law. There, the carrier is not entitled to freight unless and until actual delivery of the goods occurs. See the Eliza Lines, 199 U.S. 119, 129, 26 S.Ct. 8, 10, 50 L.Ed. 115, 119 (1905). And if the carrier loses part of the cargo at sea, it is entitled to freight only in proportion to the cargo actually delivered. See H. Longley, supra, § 20.02(1). Our holding today, under the prepaid clause, is nothing but the analog of such prorata freight principles
 
 
 [94]
 ADM's only serious argument is that the Court failed to credit ADM with the one day, 15 hours, that it actually took for the Nedon to sail from the point the charter became effective to Mobile, prior to loading. The Nedon went on charter on October 13, 1974, at 0900 hours. From that time through December 19, 1974, is 67 days, 15 hours. The District Judge used that figure but did not deduct for the pre-October 15 period. Following the District Judge's method of calculation, the one day, 15 hour, credit would require a $6,256.25 adjustment of the award in favor of ADM
 
 
 [95]
 The NEDON was detained in Mobile with the flour loaded aboard for 67 days, 15 hours. The evidence discloses that the daily charter hire on the NEDON was $2,850.00. Stevenson maintains that the daily profits had the vessel sailed would be $1,000.00 per day. Therefore, the total daily loss was $3,850.00. The total gross loss on account of detention would be $260,356.00, which is computed by multiplying $3,850.00 by 67 days and 15 hours
 From the gross loss of $260,356.00 the following credits are to be deducted had the vessel sailed to Arica:
 (1) 21 days, including 3 days to
 load, 13 days steaming and 5
 days to discharge = $80,850.00
(2) Panama Canal Fee = 3,000.00
(3) Fuel Expenses = 14,755.00
(4) Necessary expenses in Chile = 5,000.00
(5) Stevedoring costs in Chile = 16,000.00
 -----------
 $119,605.00
 The total deductions of $119,605.00 are to be subtracted from the gross loss of $260,356.00 resulting in the net loss of $140,751.00.
 
 
 [449]
 F.Supp. at 119 n.55
 
 
 [96]
 See 2 Williston on Contracts § 348 (3d ed. 1959). The District Judge assumed without deciding that ADM had "standing" to raise claims under the shipping contract even though "ADM (was) not the shipper and had no contractual relationship with Stevenson . . . ." 449 F.Supp. at 122. Stevenson does not contest ADM's status or "standing" on appeal
 
 
 [97]
 Thus ADM does not question Stevenson's handling of the Arizona and Southwall flour after its loading. Nor does ADM raise any question concerning the damage to the third loading day's flour which may have occurred after it was "unreasonably" loaded aboard the Nedon
 
 
 [98]
 By the express provisions in the booking note and usual bill of lading, Stevenson's duties are governed by COGSA "throughout the entire time the goods (were) in the custody of the carrier." This provision permissibly, see 49 U.S.C.A. §§ 1305 & 1307, extended Stevenson's COGSA duties beyond that of COGSA to cover the time of arrival of ship's tackle backwards to the time that Stevenson obtained "custody" of the flour, if those events differed. Thus if Stevenson took custody at a time earlier than at ship's tackle, COGSA rather than the Harter Act or common law of bailments would apply. Cf. Baker Oil Tools, Inc. v. Delta S.S. Lines, Inc., 562 F.2d 938, 940, 1978 A.M.C. 370, 372-73 (5th Cir. 1977) (bailment law applies where COGSA does not)
 
 
 [99]
 Clause No. 6:
 All cargo to be received and/or delivered by the carrier at ship's tackle and receipt and/or delivery beyond ship's tackle shall be entirely at the option of the carrier and solely at the expense of the shipper and/or consignee.
 
 
 [100]
 Clause No. 1:
 This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States of America, . . . . (which) shall govern before the goods are loaded on and after they are discharged from the ship and throughout the entire time the goods are in the custody of the carrier. The carrier shall not be liable in any capacity whatsoever for any . . . loss of or damage to the goods occurring while the goods are not in the actual custody of the carrier . . .
 Clause No. 12 (emphasis supplied):
 Any provisions herein to the contrary notwithstanding, goods may be received by the carrier at ship's tackle where its responsibilities shall commence and/or be delivered at ship's tackle where its responsibilities shall cease. Receipt and/or delivery beyond ship's tackle shall be entirely at the option of the carrier and solely at the expense and risk of the shipper and/or consignee. . . .
 
 
 [101]
 The booking note and usual bill of lading refer to receipt "at ship's tackle." The parties concede that this terminology is usually associated with the loading of the goods from wharf to ship. See 49 U.S.C.A. § 1307
 
 
 [102]
 An additional piece of evidence seems to us of little probative value to either party. Rule 8 of the Rules and Regulations for the Port of Mobile provides:
 The phrases "alongside" and "within reach of ship's tackle" when applied to the receipt of and delivery of cargo, shall be construed literally, and the responsibility of the vessel shall commence and cease at the end of the tackle used by the ship.
 ADM attacks as unauthenticated and hearsay the admission of this evidence. We believe the evidence was, however, authenticated under F.R.Evid. 901(a) and (b) (1), and was within the F.R.Evid. 803(8) (public records and documents) exception to the hearsay rule. See also F.R.Evid. 201(c) & (f) (judicial notice). We do not so decide, however, since the evidence is of no significant importance to our holding.
 
 
 [103]
 We are now in a position to discuss ADM's last contention concerning prepaid freight and other damages for the Nedon flour. That argument is based on the acceptable proposition that where the voyage is cancelled because of some fault of the carrier, prepaid freight and associated damages are not to be awarded. See, e. g., The Gracie D. Chambers, 248 U.S. 387, 392, 39 S.Ct. 149, 150, 63 L.Ed. 318, 321 (1919). But we have just decided that Stevenson was not at fault in caring for the Nedon flour prior to loading, since the responsibility for pre-loading infestation of the flour was solely ADM's. Nor are we persuaded that the slight delays by Stevenson in presenting its ships for loading, which were expressly agreed to by ADM, were so unusual in the trade that Stevenson can be regarded as at fault for that reason. We therefore reject ADM's last argument concerning the prepaid freight and other damages award
 
 
 [104]
 United States Shipping Board v. Texas Star Flour Mills, 12 F.2d 9, 1926 A.M.C. 646 (5th Cir. 1926); United States v. Central Gulf S.S. Corp., 456 F.2d 1281, 1973 A.M.C. 252 (5th Cir. 1972)
 
 
 [105]
 The other, United States v. Central Gulf S.S. Corp., 517 F.2d 687, 1975 A.M.C. 2254 (5th Cir. 1975), is an unremarkable application of Lykes
 
 
 [106]
 Cf. Compania Maritima del Nervion v. Amerop Commodities Corp., 237 F.Supp. 73, 79, 1965 A.M.C. 1601, 1608-09 (E.D.La.1964); Southwestern Sugar and Molasses Co. v. The Eliza Jane Nicholson, 138 F.Supp. 1, 1956 A.M.C. 1146 (S.D.N.Y.1956)
 
 
 [107]
 If the District Judge finds that reimbursement is not available under admiralty principles, then other state law principles should be examined as well. See Green v. Hospital Building Authority of City of Bessemer, 294 Ala. 467, 318 So.2d 701 (1975)